**FOREMOST–McKESSON, INC., et al., Appellees,**

v.

**The ISLAMIC REPUBLIC OF IRAN, Appellant.**

No. 89–7126.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 22, 1990.

Decided June 15, 1990.

Thomas G. Corcoran, Jr., with whom Henry M. Lloyd, Washington, D.C., was on the brief, for appellant.

Mark R. Joelson, with whom Mark N. Bravin, Washington, D.C., was on the brief, for appellees.

Before EDWARDS, Circuit Judge, ROBINSON, Senior Circuit Judge, and REVERCOMB,* District Judge.

Opinion for the Court filed by Circuit Judge HARRY T. EDWARDS.

HARRY T. EDWARDS, Circuit Judge:

This interlocutory appeal involves a claim by a United States business that the appellant, Islamic Republic of Iran ("Iran"), acting through various codefendants who controlled the shares and the board of directors of a dairy company in Iran, used its majority position to lock the appellee out of the management of the dairy and to deny the appellee its share of the company's earnings. Iran claims that it is immune from suit under the Foreign Sovereign Immunities Act of 1976 ("FSIA"), 28 U.S.C. §§ 1330, 1602–1611 (1988). Iran also con-

---

* Of the United States District Court for the District of Columbia, sitting by designation pursu- ant to 28 U.S.C. § 292(a) (1988).

tends that, because it lacks the constitutionally mandated minimum contacts with the forum, the District Court could not exercise *in personam* jurisdiction. Accordingly, Iran seeks reversal of the District Court's denial of its motion to dismiss.

The plaintiff-appellee companies are Foremost–McKesson, Inc., and its wholly owned subsidiaries Foremost Tehran, Inc., Foremost Shir, Inc., Foremost Iran Corporation, Foremost Foods, Inc. (individually and collectively "Foremost"), and the Overseas Private Investment Corporation ("OPIC"). In addition to responding to the issues raised by Iran, the plaintiff-appellees challenge the judgment of the District Court allowing Iran to amend its complaint to include the defenses of sovereign immunity and lack of personal jurisdiction under FSIA. Foremost also argues that, under the Treaty of Amity,[1] Iran waived its foreign sovereign immunity as to suits arising out of any commercial activity.

 With respect to the claims concerning sovereign immunity, we are constrained to remand for further development of the record. Under FSIA, agencies and instrumentalities of a foreign nation are presumed to be separate from each other and from the foreign state. *See First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 625–28, 103 S.Ct. 2591, 2599–2601, 77 L.Ed.2d 46 (1983). It is not enough to show that various government entities or officials represent a majority of the shareholders or constitute a majority of the board of directors of the applicable agency or instrumentality; in other words, mere

involvement by the state in the affairs of an agency or instrumentality does not answer the question whether the agency or instrumentality is controlled by the state for purposes of FSIA. The presumption of separateness (and whether it has been rebutted) affects the jurisdiction of the court, as well as the liability of the state, under FSIA: in order for the case to proceed under FSIA, the District Court must consider whether Iran so dominated the operations of the dairy "that a relationship of principal and agent is created." *Id.* at 629, 103 S.Ct. at 2601.

Although we affirm most of the holdings of the District Court,[2] we reject the legal test that it employed to determine Iran's claim to sovereign immunity. On remand, the District Court will be required to make more extensive preliminary findings regarding the nature and degree of control exerted by Iran over the dairy and its shareholders.[3] With regard to Iran's constitutional *in personam* ("minimum contacts") jurisdiction claim, we conclude that, because this issue was never raised below, the claim has been waived.

## I. Background

The procedural history of this case is unusually complicated. Foremost alleges that in 1959, at the request of a group of Iranian nationals, Foremost–McKesson, Inc., a Maryland corporation with its principal place of business in California, assisted in establishing a dairy, the Sherkat Sahami Labaniat Pasteurize Pak ("Pak Dairy"), in the Republic of Iran. From 1959 to 1979, Foremost provided the top management for

---

1. *See* Treaty of Amity, Economic Relations, and Consular Rights Between the United States of America and Iran, 8 U.S.T. 899 (1957), *reprinted in* Brief for Appellees, addendum at 37.

2. *See Foremost–McKesson, Inc. v. Islamic Republic of Iran*, Civ. Action No. 82–0220, 1988 WL 90397 (D.D.C. Aug. 18, 1988) ("*Foremost I*"), *reprinted in* Appendix ("App.") 91; *Foremost–McKesson, Inc. v. Islamic Republic of Iran*, Civ. Action No. 82–0220, 1988 WL 122568 (D.D.C. Nov. 8, 1988) ("*Foremost II*"), *reprinted in* App. 101; *Foremost–McKesson, Inc. v. Islamic Republic of Iran*, Civ. Action No. 82–0220, 1989 WL 44086 (D.D.C. Apr. 18, 1989) ("*Foremost III*"), *reprinted in* App. 3.

3. We emphasize the procedural posture of our conclusions. We are not making a final determination whether jurisdiction exists under FSIA; nor are we making any final factual determinations. Rather, we are addressing whether the District Court properly denied Iran's motion to dismiss. In resolving this question, we base our judgment on the facts as alleged by the plaintiff and generously construed in the plaintiff's favor. *See Gilson v. Republic of Ireland*, 682 F.2d 1022, 1026 (D.C. Cir.1982); *see also Transamerican S.S. Corp. v. Somali Democratic Republic*, 767 F.2d 998, 1000 n. 1 (D.C.Cir.1985).

the dairy and controlled its Board of Directors. During the period relevant in the instant case, Foremost held thirty-one percent of the equity interest in the dairy.

On January 22, 1982, Foremost and the Overseas Private Investment Corporation [4] filed a complaint in the District Court against Iran and several agencies and instrumentalities of Iran through which Foremost claims Iran acted. These agencies and instrumentalities included the Financial Organization for the Expansion of Ownership of Productive Units, the National Investment Company of Iran, Industrial and Mining Development Bank of Iran, the Foundation for the Oppressed and Pak Dairy. The complaint alleged that Iran, acting through the codefendant agencies and instrumentalities, illegally divested Foremost of its investment in Pak Dairy. Foremost and OPIC sought compensation for the entire value of their jointly held 19.84% insured equity interest in Pak Dairy,[5] allegedly valued at not less than $7,040,000, plus interest; compensation for their share in any dividends declared and not received before the alleged divestment of their equity interest; and various other damages, including attorneys' fees. *See* Complaint ¶¶ 38–39, *reprinted in* Appendix ("App.") 36.

On June 29, 1982, Iran responded to the complaint in what it titled an "Answer to Complaint." *See* Answer to Complaint [hereinafter 1982 Answer], *reprinted in* App. 46. In this response, Iran did not state the defenses raised in its motion to dismiss and did not admit or deny Foremost's averments, *cf.* Fed.R.Civ.P. 8(b); rather, Iran contended that prosecution of the suit was barred by the so-called Algiers Accords of January 19, 1981,[6] and that, pursuant to Executive Order No. 12,294, 46 Fed.Reg. 14,111 (1981) ("Executive Order"), the "complaint ha[d] no legal effect other than to toll the applicable statute of limitations." 1982 Answer at 1, *reprinted in* App. 46.[7] Pursuant to the terms of the Executive Order, the District Court took no action in this case while Foremost and OPIC presented their claims against Iran to the Iran–United States Claims Tribunal ("Claims Tribunal") in The Hague.

On April 10, 1986, the Claims Tribunal concluded that interference with Foremost's rights had not, by January 19, 1981, amounted to an expropriation. *See Foremost Tehran, Inc. v. Islamic Republic of Iran*, 10 Iran–United States Claims Trib. Rep. 228, 250, *reprinted in* App. 78.[8] However, the Claims Tribunal concluded that Pak Dairy had unlawfully withheld from Foremost cash dividends declared in 1979 and 1980, and it therefore awarded Foremost approximately $900,000, plus interest, against Iran. The Claims Tribunal also concluded that Pak Dairy unlawfully failed to deliver to Foremost stock certificates representing stock dividends declared in 1980 and that Pak Dairy had breached contractual obligations in failing to pay rental payments due and to return upon demand certain machines to Foremost. The Claims Tribunal awarded Foremost in excess of $500,000 in damages against Pak

---

4. OPIC is an agency of the United States that insures private overseas investments of United States nationals.

5. Foremost sought damages only for the insured portion of its shareholding: 64% of its 31% ownership or 19.84% of the total shares.

6. Declaration of the Government of the Democratic and Popular Republic of Algeria, 20 Int'l L. Materials 224 (1981) [hereinafter Algiers Accords].

7. The Executive Order provided that plaintiffs with claims arguably within the jurisdiction of the Claims Tribunal could file suit in federal court in order to toll the period of limitations for commencing the action. *See* 46 Fed.Reg. at

14,111. The Executive Order "purports only to 'suspend' the claims, not divest the federal court of 'jurisdiction.'" *Dames & Moore v. Regan*, 453 U.S. 654, 684, 101 S.Ct. 2972, 2989, 69 L.Ed.2d 918 (1981).

8. A claim must have been "outstanding" on January 19, 1981, to fall within the jurisdiction of the Claims Tribunal. *See* Algiers Accords, *supra* note 6, at art. II, ¶ 1; *see also Foremost Tehran, Inc. v. Iran*, 10 Iran–United States Claims Trib. Rep. at 233 n. 5, *reprinted in* App. 54 n. 2. The parties apparently dispute whether the Claims Tribunal's determination in favor of Iran on the expropriation claim was based on the merits or on lack of jurisdiction. However, that issue is not before us in this appeal, and, accordingly, we do not address that issue.

Dairy for the contract breaches. *See id.* at 257–58, *reprinted in* App. 88. Iran paid the amounts awarded out of the security account established at The Hague pursuant to the provisions of the Algiers Accords.

On April 1, 1988, the plaintiffs—still seeking damages for claimed losses—revived this lawsuit by filing a motion for partial summary judgment against Iran on the issue of liability. The plaintiffs alleged facts that arguably support a conclusion that the dairy was expropriated *after* the 1981 limit to the Claims Tribunal's jurisdiction. *See Foremost–McKesson, Inc. v. Islamic Republic of Iran,* Civ. Action No. 82–0220, slip op. at 2 (D.D.C. Apr. 18, 1989) ("*Foremost III*"), *reprinted in* App. 4.[9]

In response to Foremost's reactivation of the suit, Iran moved to strike its 1982 Answer from the record and separately moved to stay the proceedings. The District Court denied both motions, but it denied the motion to strike without prejudice to a motion by Iran to file an amended answer. *See Foremost–McKesson, Inc. v. Islamic Republic of Iran,* Civ. Action No. 82–0220, slip op. at 1 (D.D.C. Aug. 18, 1988) ("*Foremost I*"), *reprinted in* App. 91. Iran then moved to amend its 1982 Answer and the District Court granted its motion. *See Foremost–McKesson, Inc. v. Islamic Republic of Iran,* Civ. Action No. 82–0220, slip op. at 5 (D.D.C. Nov. 8, 1988) ("*Foremost II*"), *reprinted in* App. 105. The District Court rejected Foremost's and OPIC's contentions that the court did not have authority to or, alternatively, could not, without abusing its discretion, permit Iran to assert certain jurisdictional defenses not included in the 1982 Answer. *Id.*

Concurrently, Iran filed a motion to dismiss the underlying complaint, pursuant to Rule 12(b)(1) and (2) of the Federal Rules of Civil Procedure, for lack of jurisdiction under FSIA. The District Court denied

Iran's motion to dismiss. *See Foremost III,* Civ. Action No. 82–0220 (D.D.C. Apr. 18, 1989), *reprinted in* App. 3. Iran then filed this interlocutory appeal.

## II. ANALYSIS

### A. *Introduction*

The Foreign Sovereign Immunities Act connects the issue of subject matter jurisdiction to the issue of sovereign immunity. *See* 28 U.S.C. § 1330(a). District courts in a civil action against a foreign state, or the agency or instrumentality of a foreign state, lack subject matter jurisdiction unless one of the exceptions to immunity applies. *See* 28 U.S.C. §§ 1330(a), 1603(a), 1605–1607. Personal jurisdiction under FSIA exists so long as subject matter jurisdiction exists and service has been properly made pursuant to 28 U.S.C. § 1608. *See* 28 U.S.C. § 1330(b). Thus, if none of the exceptions to sovereign immunity applies, district courts lack jurisdiction in suits against a foreign state, or an agency or instrumentality thereof.[10]

Iran and Foremost present numerous challenges to the District Court determinations bearing on both subject matter and personal jurisdiction under FSIA. At the center of the challenges is the question whether Iran is immune from suit under FSIA. In the analysis that follows, we first address the issue of the jurisdiction of *this* court to review the District Court's decisions on interlocutory appeal. We next consider whether the District Court properly permitted Iran to amend its 1982 Answer to include the defense of sovereign immunity. Third, we address Iran's claim that the District Court erred in attributing to Iran the actions of Pak Dairy and its majority shareholders, which are allegedly agencies or instrumentalities of Iran. Fourth, we consider whether the District Court erred in concluding that the actions attributed to

---

9. The Supreme Court explained in *Dames & Moore,* 453 U.S. at 684–85, 101 S.Ct. at 2989–90, that, "[a]s we read the Executive Order, those claims not within the jurisdiction of the Claims Tribunal will 'revive' and become judicially enforceable in United States courts."

10. The *statutory* requirements for personal jurisdiction do not affect the constitutional *in personam* jurisdiction requirement that, pursuant to the due process clause of the Fifth Amendment, certain "minimum contacts" must exist between the person and the jurisdiction. *See, e.g., Gilson v. Republic of Ireland,* 682 F.2d 1022, 1028 (D.C.Cir.1982).

Iran in the complaint were sufficiently commercial and the effects sufficiently "direct" —pursuant to the commercial activity exception to sovereign immunity, *see* 28 U.S.C. § 1605(a)(2)—to withstand Iran's motion to dismiss. Next we consider whether Iran waived its immunity by signing the Treaty of Amity. Finally, we address the claims regarding constitutional *in personam* ("minimum contacts") jurisdiction.

### B. *Interlocutory Appeal*

■ Neither party has challenged this court's authority to review the District Court's determinations on interlocutory appeal. Even where our jurisdiction is uncontested by the parties, however, we are constrained to act only within our jurisdictional authority. *See Tuck v. Pan American Health Organization*, 668 F.2d 547, 549 (D.C.Cir.1981) ("Jurisdiction is, of necessity, the first issue for an Article III court. The federal courts are courts of limited jurisdiction, and they lack the power to presume the existence of jurisdiction in order to dispose of a case on any other grounds.").

■ In this case, we adhere to the law of this circuit, *see Transamerican S.S. Corp. v. Somali Democratic Republic*, 767 F.2d 998, 1000 (D.C.Cir.1985), and other circuits as well, *see, e.g., Rush–Presbyterian–St. Luke's Medical Center v. Hellenic Republic*, 877 F.2d 574, 576 n. 2 (7th Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 333, 107 L.Ed.2d 322 (1989); *Gould, Inc. v. Pechiney Ugine Kuhlmann*, 853 F.2d 445, 450–51 (6th Cir.1988); *Compania Mexicana de Aviacion, S.A. v. United States District Court*, 859 F.2d 1354, 1358 (9th Cir.1988) (*per curiam*); *Reale Int'l, Inc. v. Federal Republic of Nigeria*, 647 F.2d 330, 331 & n. 4 (2d Cir.1981); *Velidor v. L/P/G Benghazi*, 653 F.2d 812, 816 (3d Cir.1981), *cert. dismissed*, 455 U.S. 929, 102 S.Ct. 1297, 71 L.Ed.2d 474 (1982), in granting interlocutory appeal of the District Court's denial of the foreign state's motion to dismiss on grounds of sovereign immunity. Such an appeal comes within the ambit of the "collateral order doctrine" articulated in *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541, 545–47, 69 S.Ct. 1221, 1225–26, 93 L.Ed. 1528 (1949), because, as the Seventh Circuit explained, "sovereign immunity is an immunity from trial and the attendant burdens of litigation, and not just a defense to liability on the merits." *Rush–Presbyterian–St. Luke's Medical Center*, 877 F.2d at 576 n. 2.

### C. *Amendment of the 1982 Answer to Include the Defense of Sovereign Immunity*

■ Foremost contends that the District Court erred in granting Iran's motion to amend its complaint to include the defense of sovereign immunity. Foremost argues that by filing the 1982 Answer without asserting the defense of sovereign immunity, Iran permanently waived its immunity "by implication," pursuant to 28 U.S.C. § 1605(a)(1). We cannot agree.

Section 1605(a)(1) provides that a foreign sovereign is not "immune from the jurisdiction of courts of the United States . . . in any case . . . in which the foreign state has waived its immunity either explicitly or by implication." Foremost is correct in asserting that, in most instances, a state's failure to assert sovereign immunity in a responsive pleading will constitute a waiver of the defense. But the situation here is different because, in 1982, Iran did not respond substantively to any of the averments in the complaint or pose any defenses to the claims; instead, Iran merely argued that the action should proceed in another forum, which it then did. Iran's actions in these circumstances did not constitute an implied waiver.

It is true that the House Report accompanying FSIA provides that "[a]n implicit waiver would . . . include a situation where a foreign state has filed a responsive pleading in an action without raising the defense of sovereign immunity." H.Rep. No. 1487, 94th Cong., 2d Sess. 18 (1976), U.S.Code Cong. & Admin.News 1976, pp. 6604, 6616. We agree with the Seventh Circuit, however, that the example of an implied waiver given in the legislative history—filing a responsive pleading without raising an

immunity defense—demonstrates that Congress anticipated, at a minimum, that waiver would not be found absent a conscious decision to take part in the litigation and a failure to raise sovereign immunity despite the opportunity to do so. *Frolova v. Union of Soviet Socialist Republics,* 761 F.2d 370, 378 (7th Cir.1985) (citation omitted). Iran's 1982 Answer does not exhibit such a conscious decision or opportunity.

The 1982 Answer does not admit or deny any of the averments upon which Foremost relied; nor does it state any defenses to the claims Foremost asserted. *Cf.* Fed.R. Civ.P. 8(b). Indeed, Iran explicitly stated in the 1982 Answer that "the action commenced by the filing of plaintiffs' complaint has no legal effect other than to toll the applicable statute of limitations" and that "no response to plaintiffs' complaint is required." 1982 Answer at 1, 2, *reprinted in* App. 46, 47. As though to dispel any doubt, Iran further stated that "[t]he foregoing is without prejudice to any of defendant's rights against the United States or plaintiffs, either in this forum or before the Arbitral Tribunal." *Id.* at 2, *reprinted in* App. 47. While such statements would not, in most contexts, excuse the failure to assert a defense in a responsive pleading, the circumstances of this case are unusual because of the Executive Order. Iran contended, and Foremost conceded below, that Executive Order No. 12,294 did not even contemplate the filing of a responsive pleading in cases, like this one, that were referred to the Claims Tribunal under the Algiers Accords. *See Foremost I,* slip op. at 5 n. 6, *reprinted in* App. 95 & n. 6. We need not reach the issue whether the 1982 Answer is a responsive pleading for purposes of the Federal Rules of Civil Procedure. In the unusual circumstances of this case, it is clear that Iran did not make a "conscious decision to take part in the litigation" before the District Court.

Application of the implied waiver provision in the instant case would be inconsistent with the substantial precedent construing the implied waiver provision narrowly. The legislative history of FSIA gives three examples of circumstances in which courts have found implied waivers: (1) a foreign state has agreed to arbitration in another country; (2) a foreign state has agreed that the law of a particular country governs a contract; or (3) a foreign state has filed a responsive pleading in an action without raising the defense of sovereign immunity. *See* H.REP. No. 1487, 94th Cong., 2d Sess. 18 (1976); SEN.REP. No. 1310, 94th Cong., 2d Sess. 18 (1976). In reviewing the case law bearing on the breadth of the implicit waiver provision, the Seventh Circuit noted that "[c]ases involving arbitration clauses illustrate that provisions allegedly waiving sovereign immunity are narrowly construed" and that the narrow construction of the implicit waiver clause is also evident in "the line of cases holding that a contract's waiver of immunity does not apply to third parties not privy to the contract." *Frolova,* 761 F.2d at 377; *see also id.* at n. 10 (citing cases). The *Frolova* court further noted that, with regard to contract provisions, "courts rarely find that a nation has waived its sovereign immunity, particularly with respect to suits brought by third parties, without strong evidence that this is what the foreign state intended." *Id.* at 377.

In rejecting the plaintiff's contention that the foreign sovereign had implicitly waived its immunity by not defending the action, the Seventh Circuit further noted that

> [t]he case law evidences a reticence to find a waiver from the nature of a foreign state's participation in litigation. For example, in *Castro v. Saudi Arabia,* 510 F.Supp. [309, 311–12 (W.D.Tex. 1980)], the court held that the defendant's failure to timely answer the complaint did not waive sovereign immunity. And in *Canadian Overseas Ores Ltd. v. Compania de Acero del Pacifico S.A.,* 727 F.2d 274, 277–78 (2d Cir.1984), the court ruled that the district court did not err in finding that sovereign immunity was not waived, although the defendant never filed a responsive pleading but instead filed several motions which did not assert sovereign immunity, and a Rule 12(b)(1) motion to dismiss based on sovereign immunity was not filed until over

two and one-half years after the complaint was filed.

*Id.* at 378.[11]

Finally, the mechanistic application of the implied waiver urged by Foremost would be inconsistent with the notions of "grace and comity" that underlie the statutory scheme. *See Verlinden B.V. v. Central Bank of Nigeria,* 461 U.S. 480, 486, 103 S.Ct. 1962, 1967, 76 L.Ed.2d 81 (1983). In effecting these underlying policy concerns, this court noted in *Practical Concepts* that "[i]ntolerant adherence to default judgments against foreign states could adversely affect this nation's relations with other nations and 'undermine the State Department's continuing efforts to encourage ... foreign sovereigns generally[ ] to resolve disputes within the United States' legal framework.' " 811 F.2d at 1551 n. 19 (quoting Brief for the United States as Amicus Curiae at 13–15). In this regard, the District Court "speculate[d] that an intolerant elevation of form over substance in this case, by deeming Iran's original 'answer' to have waived the defense of sovereign immunity, will almost certainly undermine the confidence of foreign states in the fairness of our legal system." *Foremost II,* slip op. at 18–19, *reprinted in* App. 118–19. We agree.

On the record before us, we conclude that the District Court properly permitted Iran to amend the 1982 Answer to include the defense of sovereign immunity.[12]

## D. *Attributing Acts to the Sovereign*

Before proceeding to consider the various exceptions to sovereign immunity at issue in this case, we must first address Iran's attribution argument. In this suit, Foremost seeks to hold the foreign sovereign of Iran responsible for the actions of Pak Dairy and/or the entities holding the majority of Pak Dairy shares. Iran claims that the District Court erred in attributing to Iran the actions of the Board of Directors of Pak Dairy, even for purposes of jurisdiction. The District Court made few findings of its own regarding the degree of control exerted by Iran over Pak Dairy or over the shareholder-entities that Foremost alleges are government controlled, although Foremost tendered extensive affidavits in support of its position, *see, e.g.,* Affidavit of Leonard M. Patterson, Jr., *reprinted in* Brief for Appellees addendum at 1–16; Affidavit of Frank Fisher, *reprinted in* Brief for Appellees addendum at 17–36. Instead, the District Court concluded that the Claims Tribunal had decided in Foremost's favor an issue "sufficiently related to permit reliance on the Claims Tribunal's finding, ... at least at this stage in the proceedings." *Foremost III,* slip op. at 6, *reprinted in* App. 8.

While we agree with the District Court that the issue is "whether the government of Iran exercised the necessary degree of control over the other defendants to create a principal/agent relationship and thus permit this court to deem Iran responsible for their actions," *id.,* we conclude that the question of attribution under FSIA is not, as the District Court concluded, the "same question, or at least a very similar" ques-

---

**11.** In *Practical Concepts, Inc. v. Republic of Bolivia,* this court concluded that, even though Bolivia's telegram acknowledging receipt of process might be an "appearance" under Federal Rule of Civil Procedure 55(b)(2), it was not an "appearance" for purposes of FSIA so as to bar Bolivia's assertion of sovereign immunity for the first time in its objection to a default judgment. 811 F.2d 1543, 1546 & n. 6 (D.C.Cir. 1987).

**12.** We also find Foremost's assertion that the District Court abused its discretion in granting leave to amend completely devoid of merit. Rule 15(a) of the Federal Rules of Civil Procedure provides in relevant part that "a party may amend the party's pleading only by leave of

court or by written consent of the adverse party; and leave shall be freely given when justice so requires." FED.R.CIV.P. 15(a). Such grant here certainly did not constitute an abuse of discretion. As the Supreme Court has explained,

> [i]n the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be "freely given."

*Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962).

tion, *id.*, to the one decided in Foremost's favor by the Claims Tribunal. Thus, we must remand to the District Court so that it may make further factual determinations in light of the more rigorous attribution standard required by FSIA. The Claims Tribunal's findings, without more, are not sufficient to answer the question posed by Iran's motion to dismiss for want of jurisdiction under FSIA.

### 1. The Legal Standard Under FSIA

FSIA applies to instrumentalities and agencies of the foreign sovereign, as well as to the state itself. *See* 28 U.S.C. § 1603(a), (b).[13] But instrumentalities and agencies are accorded a presumption of independent status. *See First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba,* 462 U.S. 611, 626–27, 103 S.Ct. 2591, 2599–2600, 77 L.Ed.2d 46 (1983) (*"Bancec"*). In *Bancec,* the Supreme Court applied this presumption in the liability context, considering the question whether a claim of a foreign agency was subject to set-off for the debts of its parent government. The *Bancec* Court explained that the presumption of juridical separateness may be overcome where "internationally recognized equitable principles" mandate attribution in order to avoid injustice, *id.* at 633–34, 103 S.Ct. at 2603–04, and suggested that the presumption would be overcome where "a corporate entity is so extensively controlled by its owner that a relationship of principal and agent is created." *Id.* at 629, 103 S.Ct. at 2601. The House Report accompanying FSIA set forth the reasons for separating the liabilities of one state instrumentality from those of another or from those of the state. The House Report explained that "[t]here are compelling reasons for" the presumption of separateness in 28 U.S.C. § 1610(b):

If U.S. law did not respect the separate juridical identities of different agencies or instrumentalities, it might encourage foreign jurisdictions to disregard the juridical divisions between different U.S. corporations or between a U.S. corporation and its independent subsidiary.

H.REP. No. 1487, 94th Cong., 2d Sess. 29–30 (1976), U.S.Code Cong. & Admin.News 1976, pp. 6628–29; *Bancec,* 462 U.S. at 628, 103 S.Ct. at 2600 (quoting same passage).

▮▮▮▮ The presumption of the juridical separateness of entities also applies to jurisdictional issues. *See, e.g., Gilson v. Republic of Ireland,* 682 F.2d 1022, 1029–30 (D.C.Cir.1982); *Hester Int'l Corp. v. Federal Republic of Nigeria,* 879 F.2d 170, 176 (5th Cir.1989). As noted in the Restatement, "[w]hen a state instrumentality is not immune ..., for instance because the claim arises out of a commercial activity, the claim is *ordinarily to be brought only against the instrumentality.*" 1 RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES § 452 comment c (1987) (emphasis added). In *Gilson,* as here, the plaintiff brought an action against a foreign state, the Republic of Ireland and instrumentalities thereof, for a variety of alleged commercial misdeeds. *See* 682 F.2d at 1024. This court acknowledged that " 'the activities of an agent may be attributed to the principal for jurisdictional purposes.' " *Id.* at 1026 n. 16 (quoting *East Europe Domestic Int'l Sales Corp. v. Terra,* 467 F.Supp. 383, 390 (S.D. N.Y.), *aff'd mem.,* 610 F.2d 806 (2d Cir. 1979)); *see also id.* at 1029–30. But the *Gilson* court concluded that the subject matter jurisdiction determination could not be made absent factual determinations regarding whether an agency relationship existed among the various defendants. *See id.* at 1026 n. 16, 1029. In other words,

---

13. FSIA defines a "foreign state" to include "a political subdivision of a foreign state or an agency or instrumentality of a foreign state." 28 U.S.C. § 1603(a). An "agency or instrumentality of a foreign state" means any entity
 (1) which is a separate legal person, corporate or otherwise, and
 (2) which is an organ of a foreign state or political subdivision thereof, or a majority of

whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and
 (3) which is neither a citizen of a State of the United States ... nor created under the laws of any third country.
28 U.S.C. § 1603(b).

absent an agency relationship, the court lacks subject matter jurisdiction over the foreign state for the acts of its instrumentality. *See Hester Int'l Corp.*, 879 F.2d at 176, 181; *see also Gilson*, 682 F.2d at 1026 n. 16, 1029–30. Hence, in the instant case, the District Court must determine whether the facts as alleged by Foremost—subject, of course, to challenge by Iran—show sufficient control by Iran over Pak Dairy to create a relationship of principal to agent.

 It is further clear that the *plaintiff* bears the burden of asserting facts sufficient to withstand a motion to dismiss regarding the agency relationship. *See Baglab Ltd. v. Johnson Matthey Bankers Ltd.*, 665 F.Supp. 289, 296–97 (S.D.N.Y. 1987); *cf. Hester*, 879 F.2d at 176 (plaintiff "bears the burden of proving the agency relationship" at trial); *Letelier v. Republic of Chile*, 748 F.2d 790, 795 (2d Cir.1984) ("Plaintiffs had the burden of proving that [the state instrumentality] was not entitled to separate recognition"), *cert. denied*, 471 U.S. 1125, 105 S.Ct. 2656, 86 L.Ed.2d 273 (1985). Thus, we cannot agree with Foremost that the findings of the Claims Tribunal alone are sufficient to address Iran's motion to dismiss for want of agency between Pak Dairy and Iran. The legal standards employed by the Claims Tribunal to determine liability under the Algiers Ac-

cords are not coterminous with the standards applicable to determine a claim of attribution under FSIA.

Under the Algiers Accords, Iran agreed by international compact to assume responsibility for compensating United States nationals not only for claims against Iran itself but also for claims against "any political subdivision of Iran, and any agency, instrumentality, or entity controlled by the Government of Iran or any political subdivision thereof." *See* Algiers Accords, *supra* note 6, at art. VII ¶ 3. The Claims Tribunal held that "[t]he two main indicators of government control of a corporation are the identity of its shareholders and the composition and behavior of its board of directors." *See Foremost Tehran, Inc. v. Iran*, 10 Iran–United States Trib.Rep. at 241–42, *reprinted in* App. 66. Because it was found that government controlled entities held a majority of the shares in Pak Dairy and that these entities also held a majority of the seats on the board of directors, the Claims Tribunal concluded that Pak Dairy was a corporation controlled by the government of Iran.[14]

Thus, under the Algiers Accords, because of majority shareholding and majority control of the board of directors, Pak Dairy was seen as a government agency or instrumentality for which Iran had agreed

---

**14.** *See Foremost Tehran, Inc. v. Iran*, 10 Iran–United States Claims Trib. Rep. at 242, *reprinted in* App. 67–68. A list of Pak Dairy's shareholders as of December 1979 and December 1980 indicated that Industrial and Mining Development Bank of Iran ("IMDBI," now the Industries and Mines Bank) held 3.6% of Pak Dairy's shares; National Iranian Banks Investment Company ("NIBIC") 10%; National Investment Company of Iran ("NICI") 8.3%; the Foundation for the Oppressed 9.5%; and the Financial Organization for the Expansion of Ownership of Industrial Units ("Financial Organization") 9.6%—or 41.0% altogether. In addition, 11% of the shares were held by workers and farmers who had purchased shares from the Financial Organization, for which Financial Organization retained the voting rights. *See id., reprinted in* App. 67. Before the Claims Tribunal, the parties agreed that the Financial Organization is an entity controlled by Iran. *See id.* at 241, *reprinted in* App. 65. The Financial Organization's charter was enacted by the Iranian Parliament and the Minister of the Ministry of Economic Affairs and Finance serves as Chair of its Gener-

al Assembly. However, NICI and the Foundation for the Oppressed denied that they are controlled entities. *See id.* at 233, *reprinted in* App. 55. The Claims Tribunal, looking to the nationalized bank and nationalized insurance ownership of NICI, rejected the argument that NICI was not a government entity. *See id.* at 241, *reprinted in* App. 65–66. With regard to the Foundation for the Oppressed, the Claims Tribunal followed its previous determination in concluding that the Foundation is an instrumentality controlled by the government of Iran. *See id.* at 240, *reprinted in* App. 65. The Claims Tribunal also concluded that the IMDBI is under government control by virtue of the nationalization of all banks. *See id.* at 241, *reprinted in* App. 66. In turn, it concluded that NIBIC was under the ultimate control of the Iranian government because IMDBI was NIBIC's largest shareholder. *See id.* The Claims Tribunal further reasoned that even were this 52% majority not conclusive as to control, by sometime in 1980, six of the seven Board seats were government controlled. *See id.* at 242, *reprinted in* App. 67.

to assume responsibility. We recognize that the same factors that influenced the Claims Tribunal to find liability under the Algiers Accords are relevant to determining whether an entity is an "agency or instrumentality" under section 1603(a) of FSIA. But these factors are *not* conclusive with respect to a claim of attribution under FSIA, *i.e.*, where a plaintiff seeks to overcome the presumption that a foreign state and agencies and instrumentalities thereof are separate juridical identities under FSIA. *See Hester*, 879 F.2d at 177 n. 5.

Majority shareholding and majority control of a board of directors, without more, are not sufficient to establish a relationship of principal to agent under FSIA. *See, e.g., Bancec*, 462 U.S. at 614, 620–21, 623, 103 S.Ct. at 2593, 2596–97, 2598 (looking to principles of international law and federal common law to determine when instrumentalities should not be treated as distinct from the sovereign—though the government owned all the stock and appointed delegates from governmental ministries to all the positions on the Governing Board); *Hester*, 879 F.2d at 181. ("The two factors of 100% ownership and appointment of the Board of Directors cannot by themselves force a court to disregard the separateness of the judicial entities."); *Hercaire Int'l, Inc. v. Argentina*, 821 F.2d 559, 565 (11th Cir.1987) (concluding that 100% stock ownership alone is insufficient to overcome the presumption of separate juridical existence and that there was no showing that the foreign sovereign exercised "such extensive control ... as to warrant a finding of principal and agent," nor could the court "perceive any 'fraud or injustice' which results from insulating [the instrumentality's] property from attachment in aid of execution of the judgment against" the foreign state); *Baglab Ltd.*, 665 F.Supp. at 297 (instrumentality immune from suit where plaintiff failed to substantiate its contentions that the instrumentality either made the specific loan decision of a bank it acquired or exercised "general control over the day-to-day activities of [the codefendant bank] such that [the codefendant bank] might be considered its agent"). The Claims Tribunal's findings simply do not

answer the question with respect to attribution that is posed by this case.

Moreover, here, Iran's alleged control over Pak Dairy was exercised through entities on Pak Dairy's Board, which were in turn allegedly controlled by Iran. Thus, the alleged principal/agent relationship is not a direct one and, hence, the showing required to support a claim of attribution is far from straightforward. It cannot be presumed that the interests of a foreign state and its agencies or instrumentalities always are the same. Nor can it be assumed that an official from a state entity who serves on the board of directors of another such entity always will act to serve or promote the interests of the sovereign. Thus, the question concerning an alleged agent/principal relationship between the foreign state and an agency or instrumentality thereof does not involve a meaningless inquiry. The District Court will be required to address this issue on remand.

2. Conclusory Allegations

The District Court found "on the face of Foremost's complaint allegations which, although conclusory, would amount to the degree of control necessary to attribute the actions of the co-defendants to the Government of Iran." *Foremost III*, slip op. at 6 n. 8, *reprinted in* App. 8 n. 8. Where such conclusory allegations are challenged by the sovereign, the plaintiff must provide further proof of government involvement in order to overcome the presumption of juridical separateness. Determination of "who is and is not an agent of whom will be in great part factual," *Gilson*, 682 F.2d at 1029, and the fact-finding should be "explicit," *id.* at 1026. In the instant case, the fact-findings were not sufficiently explicit.

In *Gilson*, this court determined that dismissal of the action for lack of subject matter and personal jurisdiction was "premature in light of the dearth of fact-finding done by the district court thus far," *id.*, and the court remanded for further development of the facts. Here, we conclude that the District Court's denial of Iran's motion to dismiss was premature in light of

the dearth of fact-finding and we remand for further development of the facts as to the relationship between Iran and Pak Dairy.

Where, as with foreign sovereigns, immunity involves protection from suit, not merely a defense to liability, more than the usual is required of trial courts in making pretrial factual and legal determinations. In such circumstances, it is particularly important that the court "satisfy itself of its authority to hear the case," *Prakash v. American University*, 727 F.2d 1174, 1179 (D.C.Cir.1984), *before* trial. "[P]ostponing the determination of subject matter jurisdiction until some point during or after trial" would "frustrate the significance and benefit of entitlement to immunity from suit." *Gould, Inc. v. Pechiney Ugine Kuhlmann*, 853 F.2d 445, 451 (6th Cir. 1988). Thus, "[i]n many cases a resolution of the substantive immunity law issues will be required in order to reach a decision on subject matter jurisdiction.... [A] court may have to interpret the substantive principles embodied in §§ 1605–1607 before deciding whether to take jurisdiction." *Corporacion Venezolana de Fomento v. Vintero Sales Corp.*, 629 F.2d 786, 790–91 n. 4 (2d Cir.1980), *cert. denied*, 449 U.S. 1080, 101 S.Ct. 863, 66 L.Ed.2d 804 (1981); *see also First Fidelity Bank v. Government of Antigua & Barbuda*, 877 F.2d 189, 195 (2d Cir.1989) (quoting same passage).

"[S]ince entitlement of a party to immunity from suit is such a critical preliminary determination, the parties have the responsibility, and must be afforded a fair opportunity, to define issues of fact and law, and to submit evidence necessary to the resolution of the issues." *Gould*, 853 F.2d at 451. Thus, to address a motion to dismiss under Rule 12(b)(1) where the suit involves a foreign sovereign and the court's jurisdiction over the sovereign is contested, the district court must do more than just look to the pleadings to ascertain whether to grant the motion to dismiss. The district court has "considerable latitude in devising the procedures it will follow to ferret out the facts pertinent to jurisdiction." *Prakash*, 727 F.2d at 1179. Further fact-find-

ing is clearly needed in the instant case; but in making the necessary preliminary determinations the District Court should closely control and limit the discovery and fact-finding so as to avoid "frustrat[ing] the significance and benefit of ... immunity from suit." *Gould*, 853 F.2d at 451.

### E. *Application of the Section 1605(a)(2) "Commercial Activity" Exception*

Subject matter jurisdiction in a civil action against a foreign sovereign depends on whether one of the exceptions to immunity applies. *See* 28 U.S.C. § 1330(a). In the instant case, the District Court concluded that for jurisdictional purposes on the facts alleged by Foremost, Iran lacks sovereign immunity under the third clause of 28 U.S.C. § 1605(a)(2). The third clause deprives a foreign sovereign of immunity for actions based "upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States." 28 U.S.C. § 1605(a)(2). Iran contests both the classification of the acts as a "commercial activity" and the existence of any "direct effect."

1. Commercial Activity

■ Commercial activity is defined in FSIA as

either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose.

28 U.S.C. § 1603(d). According to Iran, the complaint states a claim for expropriation—a governmental act, not a commercial one—and hence jurisdiction cannot obtain under the "commercial activity" exception of FSIA.

In rejecting Iran's argument, the District Court reasoned that there had been no formal declaration by the Government of Iran nationalizing Pak Dairy and that "the nature of the actions complained of by

Foremost sound in the nature of a corporate dispute between majority and minority shareholders." *Foremost III,* slip op. at 9, *reprinted in* App. 11. According to the District Court, Foremost's "claim essentially involves allegations that Iran, acting through its various co-defendants on Pak Dairy's Board of Directors, used its majority position to lock Foremost out of the management of the company and deny Foremost its share of the company's earnings in the form of dividends." *Id.* at n. 12.

It seems plain that Foremost's complaint alleges actions that are both commercial and governmental in nature. It is also clear that in determining its jurisdiction the District Court may consider only those actions that are commercial in nature. *Millen Indus., Inc. v. Coordination Council for No. Am. Affairs,* 855 F.2d 879, 885 (D.C.Cir.1988) (when a "transaction partakes of both commercial and sovereign elements," "jurisdiction will not obtain if the cause of action is based on a sovereign activity"). But "[o]ne allegation of the complaint ... may be sufficient to create jurisdiction." *Id.* Here, some of the alleged acts that provide the basis for Foremost's cause of action are commercial in nature, as even Iran admits. *See* Brief for Appellant at 26–27. Moreover, Iran has offered no countervailing evidence indicating that these alleged commercial acts were subsumed within a sovereign activity.

There is no indication that Iran nationalized Pak Dairy by taking it over through a process of law. Indeed, in its amended answer to the complaint, "Iran denies Pak Dairy is controlled by Iran or that it is an agency or instrumentality of Iran, as defined in 28 U.S.C. § 1603(b)." Amended Answer of Defendant Islamic Republic of Iran ¶ 11, *reprinted in* App. 124. Nor have the parties pointed to any statutory restrictions or governmental decrees or directives depriving persons outside Iran of the right to sell or transfer shares in an Iranian enterprise or of a government policy curtailing the payment of dividends. The Claims Tribunal determined that Foremost had "not proved the existence of any statutory restriction on its right to sell or otherwise dispose of its shares." *Foremost–Tehran, Inc. v. Iran,* 10 Iran–United States Claims Trib. Rep. at 250, *reprinted in* App. 78. In the absence of such countervailing evidence, the District Court properly concluded that the actions alleged were sufficiently commercial in nature to withstand Iran's motion to dismiss.[15]

### 2. Direct Effects

In further defense against the appellee's claim under section 1605(a)(2), Iran contends that none of the alleged acts of the sovereign had a "direct effect" in the United States. Without reaching the merits of the issue, we find no error in the District Court's determination that the facts alleged by Foremost exhibit sufficiently direct effects to confer subject matter jurisdiction under the third clause of section 1605(a)(2).

In support of its position, Iran cites *Zedan v. Kingdom of Saudi Arabia,* 849 F.2d 1511 (D.C.Cir.1988), in which the court held that a "direct effect" for purposes of the commercial activity exception to immunity "is one that is substantial and foreseeable," *id.* at 1514. Iran's reliance on *Zedan* is futile. In *Zedan,* this court concluded that the suffering of financial hardship in the United States from events that take place abroad is not, alone, sufficient to establish "direct effects." *See id.* at 1514, 1515. While in Saudi Arabia, Zedan—an American citizen—contracted to work for an agency of the government. He had not received the payment due under the contract at the time he returned to the United States. Zedan claimed that he suffered financial loss when the defendant-foreign sovereign failed to forward to the United States money owed him. *Id.* at 1512. The court concluded that the effects were not foreseeable. *Id.* at 1515.

---

**15.** Iran also argues that "[t]he *only* provision in the FSIA which denies to foreign states immunity from suit for the taking of property" is 28 U.S.C. § 1605(a)(3). Brief for Appellant at 28–29 (emphasis added). This claim finds no support in the case law, and Iran cites none. It is clear that if a proper showing is made, the appellee can rely on the "commercial activity" exception, under section 1605(a)(2), to pursue a claim against Iran.

Here, the effects alleged were foreseeable, substantial and direct. As to foreseeability, according to Foremost, there was a constant flow of capital, management personnel, engineering data, machinery, equipment, materials and packaging, between the United States and Iran to support the operation of Pak Dairy. *See* Complaint at ¶ 17, *reprinted in* App. 28. Foremost owned shares and had representation on the Board. It is hardly convincing that, with the close commercial ties alleged here, it would be "unforeseeable" that actions taken by the Government of Iran within its borders would have effects in the United States. In *Maritime Int'l Nominees Establishment v. Republic of Guinea*, 693 F.2d 1094, 1111 (D.C.Cir.1982), *cert. denied*, 464 U.S. 815, 104 S.Ct. 71, 78 L.Ed.2d 84 (1983), this court concluded that the financial effects on the United States company were fortuitous, since it was not contemplated in the original agreement that the United States company would share in the profits. By contrast, where a Mexican bank, the foreign instrumentality, had "engaged in a regular course of business conduct with [the American purchaser of certificates of deposit] over a several-year period," the Fifth Circuit found "direct effects." *Callejo v. Bancomer, S.A.*, 764 F.2d 1101, 1112 (5th Cir.1985). In the instant case, Foremost alleges that the involvement of Foremost *was* contemplated in the original agreement and extended over a period of years.

Nor does case law support the conclusion that the effects alleged are *insubstantial* or not "direct." The alleged effects of freezing-out American corporations in their ownership of Pak Dairy are at least as substantial and direct as effects alleged in prior cases in which this court and other circuits have found "direct effects." For example, the *Callejo* court determined that a foreign instrumentality-bank's breach of contract regarding payment of principal and interest on certificates of deposits had "direct effects" on their United States-resident owner within the meaning of FSIA. *Callejo*, 764 F.2d at 1110–12. In *Texas Trading & Milling Corp v. Federal Republic of Nigeria*, 647 F.2d 300, 312–13 (2d

Cir.1981), *cert. denied*, 454 U.S. 1148, 102 S.Ct. 1012, 71 L.Ed.2d 301 (1982), the Second Circuit determined that, under either a breach of contract or breach of letters of credit theory, Nigeria's unilateral alteration of the letters of credit and cancellation of contracts had direct effects on the United States companies that were suppliers under the contracts. And in *Transamerican S.S.*, 767 F.2d at 1004, this court determined that the effects of the foreign agency's detention of an American ship, which caused the American corporation to incur debt, and the agency's demand for payment in the United States "were both direct and substantial within the meaning of the FSIA." Adhering to this line of precedent, we find no infirmity with the District Court's determination that the alleged effects were sufficiently direct to survive Iran's motion to dismiss.

### F. *Treaty of Amity*

Foremost claims that, under the Treaty of Amity, Iran waived its sovereign immunity as to suits arising out of commercial activity in which it is involved. Thus, according to Foremost, there is no jurisdictional issue to be addressed under FSIA. We cannot agree.

Two sections of the Foreign Sovereign Immunities Act bear on consideration of the effect of the Treaty of Amity: sections 1604 and 1605(a)(1). Section 1604 of FSIA provides:

> Subject to existing international agreements to which the United States is a party at the time of enactment of this Act a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter.

28 U.S.C. § 1604. "This exception [to FSIA] applies when international agreements 'expressly conflic[t]' with the immunity provisions of the FSIA." *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 109 S.Ct. 683, 692, 102 L.Ed.2d 818 (1989). The Supreme Court found no such *express conflict* where the international conventions "set forth substantive rules of conduct" and did "not

create private rights of action for foreign corporations to recover compensation from foreign states in United States courts." *Id.* Article IV of the Treaty of Amity sets forth such substantive provisions, and hence does not pose a bar to application of FSIA.[16]

In addition, pursuant to section 1605(a)(1), if the Treaty of Amity contained an *explicit waiver* of sovereign immunity, the foreign state would not be entitled to immunity under FSIA. *See Amerada Hess,* 109 S.Ct. at 692; *Berkovitz v. Islamic Republic of Iran,* 735 F.2d 329, 333 (9th Cir.), *cert. denied,* 469 U.S. 1035, 105 S.Ct. 510, 83 L.Ed.2d 401 (1984). However, the only express provision for waiver of sovereign immunity under the Treaty of Amity is found in Article XI, paragraph 4:

> No enterprise of either High Contracting Party, including corporations, associations, and government agencies and instrumentalities, which is publicly owned or controlled shall, if it engages in commercial, industrial, shipping or other business activities within the territories of the other High Contracting Party, claim or enjoy, either for itself or for its property, immunity therein from ... suit....

8 U.S.T. at 908. We agree with the Ninth Circuit that this "limited waiver" "extends only to enterprises of Iran, not Iran itself" and "extends only to enterprises 'doing business' in the United States." *Berkovitz,* 735 F.2d at 333; *see also Jafari v. Islamic Republic of Iran,* 539 F.Supp. 209, 211 (N.D. Ill.1982) (concluding that art. XI ¶ 4 of the Treaty of Amity waives immunity of enterprises but not of Iran itself); *Mashayekhi v. Iran,* 515 F.Supp. 41, 43 (D.D. C.1981) (finding limited waiver of immunity in Article XI); *cf. Gibbons v. Republic of Ireland,* 532 F.Supp. 668, 672 (D.D.C.1982) (concluding that virtually identical treaty provision waived immunity of "enterprises" including the sovereign's instrumentalities but did not waive immunity of the sovereign itself). In the instant case, the alleged commercial actions took place in Iran not in the United States and Foremost brought the action against the sovereign itself. Thus, the provisions of Article XI, paragraph 4, are not apposite and, for the purposes of the instant case, Iran did not waive its immunity in that treaty.[17]

## G. *In Personam Jurisdiction*

In its brief to this court, Iran claims that it lacks the constitutionally mandated mini-

---

**16.** Article IV of the Treaty of Amity provides, in relevant part:

1. Each High Contracting Party shall at all times accord fair and equitable treatment to nationals and companies of the other High Contracting Party, and to their property and enterprises; shall refrain from applying unreasonable or discriminatory measures that would impair their legally acquired rights and interests; and shall assure that their lawful contractual rights are afforded effective means of enforcement, in conformity with the applicable laws.

2. Property of nationals and companies of either High Contracting Party, including interests in property, shall receive the most constant protection and security within the territories of the other High Contracting Party, in no case less than that required by international law. Such property shall not be taken except for a public purpose, nor shall it be taken without the prompt payment of just compensation. Such compensation shall be in an effectively realizable form and shall represent the full equivalent of the property taken; and adequate provision shall have been made at or prior to the time of taking for the determination and payment thereof.

....

4. Enterprises which nationals and companies of either High Contracting Party are permitted to establish or acquire, within the territories of the other High Contracting Party, shall be permitted freely to conduct their activities therein, upon terms no less favorable than other enterprises of whatever nationality engaged in similar activities. Such nationals and companies shall enjoy the right to continued control and management of such enterprises; to engage attorneys, agents, accountants and other technical experts, executive personnel, interpreters and other specialized employees of their choice; and to do all other things necessary or incidental to the effective conduct of their affairs.

Treaty of Amity, Economic Relations, and Consular Rights Between the United States of America and Iran, 8 U.S.T. 899, 903–04, art. IV (1957).

**17.** We do not decide here in what contexts, if any, the Treaty of Amity might constitute a waiver of immunity. We conclude only that the treaty has not effected a waiver in the instant case.

mum contacts with the forum for the District Court to exercise *in personam* jurisdiction. Foremost contends that Iran has waived any claim on this matter because the issue was never raised below. We agree.

In the proceedings before the District Court, Iran's only defense resting on personal jurisdiction involved a *statutory* claim. Iran's memorandum in support of its motion to dismiss contained but one sentence regarding personal jurisdiction: "Because under the FSIA personal jurisdiction cannot exist unless there is subject-matter jurisdiction, 28 U.S.C. § 1330(b), the Court also lacks personal jurisdiction." Memorandum of Points and Authorities in Support of Motion to Dismiss and in Opposition to Motion for Partial Summary Judgment at 11 (Sept. 7, 1988). Iran mentioned an absence of "minimum contacts" only in the context of its claim that its actions in Iran had no direct effects in the United States. *See id.* at 7.

Iran may not now raise the separate constitutional ground for a claim of lack of *in personam* jurisdiction. Claims regarding defects in personal jurisdiction are waived if not raised. *See* FED.R.CIV.P. 12(g), (h); *see also Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 703–07, 102 S.Ct. 2099, 2104–07, 72 L.Ed.2d 492 (1982) (noting that a constitutional *in personam* jurisdiction claim is waived if not timely raised); *cf. Anger v. Revco Drug Co.*, 791 F.2d 956, 958 (D.C.Cir.1986) (*per curiam*) (concluding that "the Federal Rules of Civil Procedure indicate that personal jurisdiction is a matter to be raised by motion or responsive pleading, not by the court *sua sponte*," and explaining that lack of personal jurisdiction is a threshold defense open to a party, "but subject to foreclosure absent timely objection"). It is also well settled that a party may not raise a new legal theory on appeal for the first time. *See, e.g., District of Columbia v. Air Florida, Inc.*, 750 F.2d 1077, 1084 (D.C.Cir.1984). Thus, we deny Iran's request for reversal or remand on this issue.

### III. CONCLUSION

The findings of the Claims Tribunal, without more, are not sufficient to overcome the presumption of the independent status of foreign agencies, instrumentalities and states. In making the threshold jurisdictional determination, the District Court must consider whether the relationship between Pak Dairy and Iran is one of a principal to an agent. Thus, we remand to the District Court for more extensive findings on the degree of control exerted by Iran over Pak Dairy and over the shareholder entities that Foremost alleges are government controlled. For the reasons set forth in this opinion, we affirm the District Court's determinations with respect to all the other issues raised in this appeal.

*It is so ordered.*