**Tara Ann JUNGQUIST, et al., Appellees,**

v.

**SHEIKH SULTAN BIN KHALIFA AL NAHYAN, et al., Appellants.**

No. 96–7220.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 20, 1997.

Decided June 17, 1997.

T. Barry Kingham, New York City, argued the cause for appellants, with whom George Kahale, III and Miriam K. Harwood were on the briefs.

R. Kenly Webster, Washington, DC, argued the cause and filed the brief for appellees. Michael W. Kirk entered an appearance.

Before WALD, GINSBURG and ROGERS, Circuit Judges.

Opinion for the Court filed by Circuit Judge ROGERS.

ROGERS, Circuit Judge:

In this interlocutory appeal of the denial of their motion to dismiss the complaint for lack of subject matter and personal jurisdiction, appellants Sheikh Sultan Bin Khalifa Al Nahyan ("Sheikh Sultan"), Khalil I. Al–Malki, Osama Al Baba, and Faisal M. Seddiq Samea contend first, that they are entitled to immunity under the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. § 1602 *et seq.* ("FSIA"), and second, that due to their lack of contact with the District of Columbia, the district court did not have personal jurisdiction over them. Concluding that we have jurisdiction to consider the immunity claims under the collateral order doctrine, and may properly exercise pendent appellate jurisdiction over the non-immunity jurisdictional contentions, we reverse. Although we conclude that the evidence of a personal promise by Sheikh Sultan to compensate appellees Jungquists for medical expenses and injuries to Tara Jungquist from a boating accident in Abu Dhabi defeats the Sheikh's claim to immunity under the FSIA, we also conclude that the district court erred in ruling that it had personal jurisdiction over the Sheikh. The district court also erred in ruling it had personal jurisdiction over Samea. As to Al–Malki and Al Baba, because the evidence showed that they acted in their official capacities on behalf of a foreign state and the commercial activities exception is inapplicable, they are entitled to FSIA immunity.

## I.

According to the complaint, Tara Jungquist, a sixteen-year-old living with her parents, who were United States citizens working in Abu Dhabi,[1] and her older sister Michelle Jungquist attended a boat outing in May 1993, that was organized by Sheikh Sultan, the eldest son of the Crown Prince of Abu Dhabi and the President of the Crown Prince Court.[2] Sheikh Sultan had invited Tara and Michelle in recognition of their work for the Abu Dhabi International Fair, an event hosted by the Sheikh as Honorary Chairman of the Chamber of Commerce. On the return trip from Sheikh Sultans's private island, the Sheikh and one of his guests, after consuming alcoholic beverages, negligently caused two motorboats to collide. Tara was ejected into the water, and as she came to the surface, the rotating propeller of the boat driven by Sheikh Sultan struck and penetrated her skull, causing brain damage, a gash on her left leg, cuts on her hand, and other injuries. She was rushed to local hospitals where she received emergency neurosurgery.

At that time, Sheikh Sultan informed Michelle Jungquist by telephone that he was responsible for the collision and promised that he personally and the Crown Prince Court would fully compensate Tara and her parents for Tara's medical expenses and injuries. The next week Sheikh Sultan, personally and through his agents, reaffirmed to Tara's parents his intention to abide by his promise. For more than a year Tara received medical treatment at several hospitals in Abu Dhabi and elsewhere that was paid for by the Abu Dhabi government, and her family was compensated for related expenses, pursuant to arrangements approved by the Sheikh and carried out by other defendants. Tara's treatments were paid for under the aegis of a medical program of the Abu Dhabi government and administered by the Crown Prince's Court for all citizens and residents in need of foreign medical treatment.

Tara first received treatment abroad by a specialist in Aachen, Germany, who saw her within weeks of the accident. Sheikh Sultan flew to Germany to visit her and, while there,

---

1. Abu Dhabi is one of the seven autonomous emirates that form the United Arab Emirates.

2. The Abu Dhabi Crown Prince Court is the administrative arm of the government of Crown Prince Sheikh Khalifa Bin Zayed Al Nahyan ("Sheikh Khalifa"), Sheikh Sultan's father.

again acknowledged his responsibility for the accident and his intention to take care of Tara's expenses; he also gave Tara a diamond watch and a diamond and sapphire necklace. On the recommendation of her doctors in Germany, and pursuant to Sheikh Sultan's instructions, appellant Faisal M. Seddiq Samea, a personal friend and confidant of the Sheikh as well as his secretary at the Crown Prince Court, arranged for Tara to go to the United States for specialized medical treatment and evaluation. In late May, Tara was transferred to Emory Hospital in Atlanta, Georgia, for optic nerve testing and a neurological review, including brain scans and magnetic resonance imaging ("MRI"). Later, she received additional testing, including an MRI, at Johns Hopkins University in Baltimore, Maryland. She returned to Abu Dhabi in September, and between September 1993 and January 1994, she underwent additional neurological and neuropsychological testing in Abu Dhabi hospitals.[3]

In January 1994, Tara returned to the United States for more specialized testing and treatment. For the next six months, with the approval of the Medical Attache at the United Arab Emirates ("UAE") Embassy, Tara received extensive testing, evaluation, speech therapy, psychological evaluation, and physical therapy for her leg injury at the National Rehabilitation Hospital in the District of Columbia. Pursuant to UAE authorization, she and her mother received a housing and subsistence allowance while living in the District of Columbia, and established a bank account there to receive the allowance through direct deposits. In March 1994, after Michelle Jungquist complained about a reduction in the allowance, Sheikh Sultan reaffirmed his commitment to pay for Tara's medical expenses and to compensate her for her injuries.

In July 1994, the payments for Tara's medical treatment and related expenses stopped. Earlier that month the National Rehabilitation Hospital and the Jungquists provided a medical report to the UAE's Medical Attache indicating that Tara would require indefinite, long-term medical care to treat the damage to her brain. The Crown Prince Court directed the UAE Medical Attache to refuse to approve further medical treatment for Tara. In August, Al Baba contacted one of Tara's treating physicians in an unsuccessful attempt to persuade him to alter his diagnosis that Tara would require indefinite medical care.

The Jungquists filed suit for money damages, asserting tort, contract, and conspiracy claims, against eight defendants, including the UAE; the Emirate of Abu Dhabi; the Abu Dhabi Crown Prince Court; and Sheikh Khalifa Bin Zayed Al Nahyan, the Crown Prince of Abu Dhabi, as well as appellants Sheikh Sultan; Faisal M. Seddiq Samea; Khalil I. Al–Malki, the UAE Embassy's Medical Attache in the District of Columbia; and Osama Al Baba, the Director of Patient Relations at the UAE Medical Attache's Office in the District of Columbia.[4] The Jungquists sued each appellant for civil conspiracy, fraud, fraud in the inducement, and intentional infliction of emotional distress, and also sued Sheikh Sultan for negligence, negligent entrustment, breach of contract, promissory estoppel, loss of filial consortium, and loss of services. The complaint alleged that in reliance on the promises of Sheikh Sultan and his agents, the Jungquists agreed to "cooperate in protecting Sheikh Sultan from public and private exposure concerning his presence at, involvement in, and responsibility for the collision and the illicit activities engaged in during the boat outing." According to the complaint, under Islamic law, a person who causes a collision resulting in

3. According to the complaint, during this period Tara's father was dismissed by his employer, the Abu Dhabi National Oil Company for Distribution, allegedly at the request of Sheikh Sultan, and informed that he and his family had to leave Abu Dhabi. Also in the fall of 1993, Tara's parents were allegedly harassed by having the water, electricity, and telephone periodically shut off at their home, by having their business car taken away, and by being followed and surveilled by unknown persons.

4. The district court granted the motion to dismiss the complaint as to defendants UAE, the Emirate of Abu Dhabi, the Crown Prince Court, and Sheikh Khalifa Bin Zayed Al Nahyan, the Crown Prince of Abu Dhabi, and the Jungquists do not appeal this part of the district court's order.

injury requiring hospitalization may be incarcerated until the victim is released, and if the injury is permanent, the person who caused the accident can be incarcerated permanently. Further, the complaint alleged that Sheikh Sultan's father had told him that "if he was lying about [his non-involvement in] the collision, he would personally take Sheikh Sultan 'for a walk in the desert,' meaning that he would cause his son to die."

The defendants moved to dismiss on the grounds that the district court lacked jurisdiction over the subject matter and parties, and on the basis of *forum non conveniens.* As part of the discovery on the jurisdictional issues, Michelle and Calvin Jungquist submitted affidavits to the effect that Sheikh Sultan had promised that both he, in his personal capacity, and the Crown Prince Court would take care of Tara's medical expenses and her family's related expenses, and that the Sheikh took a number of actions personally to ensure that Tara received treatment and that her expenses and those of her family were taken care of from May 1993 until July 11, 1994. The district court denied in part the motion to dismiss, *Jungquist v. Al–Nahyan,* 940 F.Supp. 312, 323 (D.D.C. 1996), and the non-dismissed defendants appeal.[5]

## II.

■ Initially, we must address the Jungquists' contention that the court lacks jurisdiction to review the denial of appellants' motion to dismiss on interlocutory appeal. While acknowledging that the court has appellate jurisdiction to consider appeals from final orders denying certain claims of immunity from suit under the "collateral order doctrine," *Cohen v. Beneficial Industrial Loan Corp.,* 337 U.S. 541, 546, 69 S.Ct. 1221, 1226, 93 L.Ed. 1528 (1949), the Jungquists, relying on *Johnson v. Jones,* 515 U.S. 304, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995), maintain that the resolution of the FSIA immunity claim falls outside the collateral order doctrine because it merely "resolved a *fact*-related dispute about the pre-trial record."

*Id.* at 307, 115 S.Ct. at 2153. They also maintain that the court should decline to exercise pendent appellate jurisdiction over the non-immunity claims, which, the parties agree, do not fall under the collateral order doctrine because those issues are not closely related to the immunity claims.

■ Under 28 U.S.C. § 1291, this court has jurisdiction of appeals "from all final decisions of the district courts." In interpreting this statute, the Supreme Court recognized in *Cohen,* that there is a "small class" of decisions that "finally determine claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated." 337 U.S. at 546, 69 S.Ct. at 1226. Under the collateral order doctrine, a district court order qualifies for immediate appeal as a "final order" under § 1291 if it "(1) conclusively determine[s] the disputed question, (2) resolve[s] an important issue completely separate from the merits of the action, and (3) [would be] effectively unreviewable on appeal from a final judgment." *Johnson v. Jones,* 515 U.S. at 310–12, 115 S.Ct. at 2155 (quoting *Puerto Rico Aqueduct & Sewer Authority v. Metcalf & Eddy, Inc.,* 506 U.S. 139, 144, 113 S.Ct. 684, 687, 121 L.Ed.2d 605 (1993) (quoting *Coopers & Lybrand v. Livesay,* 437 U.S. 463, 468, 98 S.Ct. 2454, 2458, 57 L.Ed.2d 351 (1978))).

It is well-established that an appeal from a denial of a motion to dismiss a complaint on the ground of sovereign immunity under the FSIA satisfies the three requirements of the collateral order doctrine and may thus be brought on an interlocutory basis. *Foremost–McKesson v. Islamic Republic of Iran,* 905 F.2d 438, 443 (D.C.Cir.1990); *see McKesson Corp. v. Islamic Republic of Iran,* 52 F.3d 346, 353 (D.C.Cir.1995), *cert. denied,* — U.S. ——, 116 S.Ct. 704, 133 L.Ed.2d 660 (1996); *Princz v. Federal Republic of Germany,* 26 F.3d 1166, 1168 (D.C.Cir.1994), *cert. denied,* 513 U.S. 1121, 115 S.Ct. 923, 130 L.Ed.2d 803 (1995); *see*

---

**5.** Appellants do not appeal the district court's denial of the motion to dismiss on the ground of

*forum non conveniens.*

also *Federal Ins. Co. v. Richard I. Rubin & Co., Inc.*, 12 F.3d 1270, 1279–82 (3d Cir.1993) (citing similar decisions from six circuits), *cert. denied sub nom. Ejay Travel v. Algemeen Burgerlijk Pensioenfonds*, 511 U.S. 1107, 114 S.Ct. 2101, 128 L.Ed.2d 663 (1994). The district court's denial of dismissal on grounds of sovereign immunity is conclusive and final as to that issue; the issue of sovereign immunity is distinct from the question of liability on the claims asserted in the complaint; and the order denying dismissal for immunity is effectively unreviewable on appeal because " 'sovereign immunity is an immunity from trial and the attendant burdens of litigation, and not just a defense to liability on the merits.' " *Foremost–McKesson*, 905 F.2d at 443 (quoting *Rush–Presbyterian–St. Luke's Medical Center v. Hellenic Republic*, 877 F.2d 574, 576 n. 2 (7th Cir.), *cert. denied*, 493 U.S. 937, 110 S.Ct. 333, 107 L.Ed.2d 322 (1989)).

*Johnson*, 515 U.S. 304, 115 S.Ct. 2151, 132 L.Ed.2d 238, does not require a contrary conclusion. There, the Supreme Court held that government officials entitled to assert a qualified immunity defense in a "constitutional tort" action were not entitled to appeal immediately the denial of summary judgment based on a finding that the pretrial evidence was sufficient to show a material issue of fact for trial. *Id.* at 305–10, 115 S.Ct. at 2153–54. The Court noted that, unlike a claim of immunity, which is conceptually distinct from the merits of the action, a claim of evidence insufficiency cannot be said to present a "separate" question that is "significantly different from the fact-related legal issues that likely underlie the plaintiff's claim on the merits." *Id.* at 314, 115 S.Ct. at 2157. The Court observed that "considerations of delay, comparative expertise of trial and appellate courts, and wise use of appellate resources" favor limiting appeals of "qualified immunity" matters to cases raising broader issues of law, rather than fact-specific questions concerning the existence of a triable issue of fact. *Id.* at 314–18, 115 S.Ct. at 2157–58.

The determination of whether appellants are entitled to claim sovereign immunity because they were acting in their official capacities, and thus were agencies or instrumentalities of a foreign state, does require the court to apply law to facts. But, as the Supreme Court has explained, "*Johnson* held, simply, that determinations of evidentiary sufficiency at summary judgment are not immediately appealable merely because they happen to arise in a qualified-immunity case; if what is at issue in the sufficiency determination is nothing more than whether the evidence could support a finding that particular conduct occurred, the question decided is not truly 'separable' from the plaintiff's claim, and hence there is no 'final decision' under *Cohen* . . . ." *Behrens v. Pelletier*, —— U.S. ——, ——, 116 S.Ct. 834, 842, 133 L.Ed.2d 773 (1996). The question of the applicability of sovereign immunity, as *Johnson* itself recognized, 515 U.S. at 314–16, 115 S.Ct. at 2157, is "separable" from a determination of the merits of the lawsuit. Thus, our consideration of appellants' interlocutory appeal from the denial of their FSIA claim is permissible under the collateral order doctrine and is not inconsistent with *Johnson*.[6]

■■■ The Jungquists' further contention that this court should not assume pendent appellate jurisdiction over appellants' non-immunity claims fares no better. "A circuit court exercises pendent jurisdiction when, in the course of reviewing an order from which an appeal is within its jurisdiction, it hears an appeal from another order that, while part of the same case or controversy, would not otherwise be within its statutory jurisdiction." *Gilda Marx, Inc. v. Wildwood Exercise, Inc.*, 85 F.3d 675, 678 (D.C.Cir.1996); *see also Consarc Corp. v. Iraqi Ministry*, 27 F.3d 695, 700 (D.C.Cir.1994); *Lee v. Ply*Gem Industries, Inc.*, 593 F.2d 1266, 1270 (D.C.Cir. 1979), *cert. denied*, 441 U.S. 967, 99 S.Ct. 2417, 60 L.Ed.2d 1073 (1979). Indeed, the court exercises pendent jurisdiction sparingly, "only when substantial considerations of fairness or efficiency demand it." *Gilda Marx*, 85 F.3d at 678–79; *see also Swint v.*

---

**6.** Because we do not reach appellants' claims concerning head-of-state and diplomatic immunity, we need not address the Jungquists' contention that *Johnson* precludes review of those claims.

*Chambers County Com'n*, 514 U.S. 35, 50, 115 S.Ct. 1203, 1212, 131 L.Ed.2d 60 (1995). We conclude that it is appropriate to exercise pendent appellate jurisdiction over appellants' non-immunity claims.

■ Contrary to the Jungquists' contention, the availability of pendent appellate jurisdiction is not limited to circumstances where claims are "so closely related" that review of the former is necessary to, or will dispose of, review of the latter. *Gilda Marx*, 85 F.3d at 679. Considerations of fairness or efficiency may also justify the exercise of pendent appellate jurisdiction when the "review will likely terminate the entire case, sparing both this court and the district court from further proceedings and giving the parties a speedy resolution." *Id.* Adopting the view of leading commentators, the court has stated:

> Jurisdiction of the interlocutory appeal is in large measure jurisdiction to deal with all aspects of the case that have been sufficiently illuminated to enable decision by the court of appeals without further trial court development. Any other rule frequently would require wasted litigation without any offsetting advantage in economy of appellate effort or uninterrupted trial court proceedings.

*Noxell Corp. v. Firehouse No. 1 Bar–B–Que Restaurant*, 760 F.2d 312, 315 (D.C.Cir.1985) (quoting CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 3921, at 17 (1977)). Because review of the district court's rulings on personal jurisdiction may dispose of the instant case, and the parties' jurisdictional discovery has sufficiently illuminated the jurisdictional facts, the exercise of jurisdiction over appellants' non-immunity claims furthers interests of fairness and efficiency, and the Jungquists offer no persuasive reason to conclude otherwise.

### III.

■ The FSIA provides that, subject to limited exceptions, "a foreign state shall be immune from the jurisdiction of the courts of the United States." 28 U.S.C. § 1604. A "foreign state" includes "political subdivision[s]" and "agenc[ies] or instrumentalit[ies]" thereof. *Id.* § 1603(a). Individuals acting in their official capacities are considered "agenc[ies] or instrumentalit[ies] of a foreign state;" these same individuals, however, are not entitled to immunity under the FSIA for acts that are not committed in an official capacity. *See El–Fadl v. Central Bank of Jordan*, 75 F.3d 668, 671 (D.C.Cir. 1996); *see also Chuidian v. Philippine Nat. Bank*, 912 F.2d 1095, 1099–1103 (9th Cir. 1990).

Appellants maintain that all of the acts underlying the Jungquists' claims were performed as official acts of the Government of Abu Dhabi.[7] Specifically, they contend that all of the treatment and related assistance provided to Tara was within the scope of the Abu Dhabi government's official medical treatment program, which is available to all citizens and residents of the country, and that all acts by appellants were consistent with their duties in managing and implementing that program. Appellants contend that, in ruling to the contrary, the district court improperly focused on their alleged motives for their actions, rather than the nature of the actions themselves. Those actions, appellants continue, demonstrate that they were taken by government officials acting as agencies or instrumentalities of a foreign state in performance of their official duties as administrators of the Abu Dhabi government's foreign medical treatment program.

■ Generally, in entertaining a motion to dismiss, the district court must accept the allegations of the complaint as true, and construe all inferences in the plaintiff's favor. *Foremost–McKesson*, 905 F.2d at 440 n. 3. Where the motion to dismiss is based on a claim of foreign sovereign immunity, which provides protection from suit and not merely a defense to liability, however, the court

---

7. Although the Jungquists maintain that in the district court Samea did not claim to be a public official and his appeal should, therefore, be dismissed, the defendants' motion to dismiss asserted that the FSIA barred the Jungquists' claims with regard to all the named defendants. Because we hold that the district court lacked personal jurisdiction over Samea, *see infra* Part IV, we do not reach his immunity under the FSIA.

must engage in sufficient pretrial factual and legal determinations to "'satisfy itself of its authority to hear the case' before trial." *Foremost–McKesson*, 905 F.2d at 449 (quoting *Prakash v. American University*, 727 F.2d 1174, 1179 (D.C.Cir.1984)). We review the district court's factual findings for clear error, *see Herbert v. National Academy of Sciences,* 974 F.2d 192, 197 (D.C.Cir.1992), and its legal conclusion that the FSIA does not apply to appellants *de novo. Princz v. Federal Republic of Germany,* 26 F.3d at 1169.

◼ As appellants maintain, the relevant inquiry in determining whether an individual was acting in an official capacity focuses on the nature of the individual's alleged actions, rather than the alleged motives underlying them. *See Chuidian,* 912 F.2d at 1106–07; *Herbage v. Meese,* 747 F.Supp. 60, 66–67 (D.D.C.1990), *aff'd without opinion,* 946 F.2d 1564 (D.C.Cir.1991); *see also Kline v. Kaneko,* 685 F.Supp. 386, 391 (S.D.N.Y.1988). Thus, in *Chuidian,* although the plaintiff alleged that the defendant had intentionally interfered with his contractual relations out of malice, the Ninth Circuit focused on whether the defendant was authorized in his official capacity to so interfere. 912 F.2d at 1106. The fact that the defendant acted out of malice was irrelevant. *Id.* The district court performed a similar analysis in the instant case, focusing on whether appellants were authorized to enter into the alleged contracts and perform the other alleged acts, and not on why appellants may have been motivated to engage in such activity.

◼ In concluding that the Jungquists' claims concerned actions by appellants that were personal and private rather than official in nature, the district court relied on the allegation that "the Crown Prince Sheikh Khalifa told his son Sheikh Sultan that if he was 'lying about [his non-involvement in] the collision, he would personally take Sheikh Sultan "for a walk in the desert," meaning that he would cause his son to die.'" *Jungquist,* 940 F.Supp. at 317 (quoting Compl. ¶ 102). The court reasoned that regardless of whether Sheikh Sultan and his agents were authorized by their offices to pay for medical treatment through Abu Dha-

bi's medical program, they could not have been authorized to do so in exchange for a promise by the Jungquists to keep the truth from the Abu Dhabi government. *Id.* at 318. Appellants fail to demonstrate that this finding is clearly erroneous. *See Foremost–McKesson,* 905 F.2d at 440 n. 3, 449. As the district court found, for purposes of FSIA analysis, appellants' actions are properly construed not simply as providing Tara with medical treatment pursuant to the government medical program, but rather as entering into a corrupt bargain whereby Tara's needs would be taken care of in exchange for the Jungquists' silence. Not only did Calvin and Michelle Jungquist submit affidavits attesting to Sheikh Sultan's repeated personal promise to compensate Tara and her parents fully for her medical expenses and injuries in return for their cooperation with the Sheikh's efforts to hide his involvement in the boating accident, but appellants do not dispute the assertions in the complaint about Islamic law or the meaning of the statement by the Sheikh's father. The district court could reasonably infer that the statement by the Sheikh's father demonstrated that the Abu Dhabi government would have no part in an allegedly corrupt bargain with the Jungquists. So viewed, it follows that Sheikh Sultan's promise to the Jungquists was, as the district court found, not in furtherance of the interests of the sovereign but a personal and private action, 940 F.Supp. at 317, and that Sheikh Sultan, therefore, is not entitled to the protection of FSIA immunity. The fact that there was some convergence between Sheikh Sultan's official and unofficial conduct does not cloak his unofficial actions with immunity under the FSIA. *Cf. Chuidian,* 912 F.2d at 1107.

◼ We reach a different conclusion as to Al–Malki and Al Baba. The Jungquists alleged that Al–Malki and Al Baba acted as Sheikh Sultan's agents or co-conspirators in committing fraud, breaching the contract, and inflicting emotional distress. Yet nearly all the alleged actions by Al–Malki and Al Baba fell within their official duties, and there is no evidence that they participated in devising or agreeing to the private bargain struck with the Jungquists. As the UAE

Medical Attache, Al–Malki was responsible for overseeing the administration of the Abu Dhabi foreign medical treatment program, which included assisting patients, supervising their medical care, and serving as the liaison between the Crown Prince Court and the patients and medical service providers. As the Director of Patient Relations for the program, Al Baba took care of logistical matters such as booking hotel accommodations, flights, and taxis, or securing documentation for patients. The only alleged actions that arguably did not fall within their official duties were their reiteration of Sheikh Sultan's personal promise to assume responsibility for the accident and Al Baba's attempt to persuade Tara's treating physician to alter his diagnosis of permanent brain damage. The latter action allegedly took place in August 1994 after Tara's participation in the medical treatment program had ended, and it is undisputed that Al Baba's official duties did not include contact with doctors concerning medical records.[8] But there is no evidence supporting either allegation; instead, the evidence supports Al–Malki's and Al Baba's contentions that they had no knowledge of a personal promise by Sheikh Sultan and that they were merely performing their official duties.

■ Furthermore, the commercial activities exception to the FSIA, 28 U.S.C. § 1605(a)(2), on which the Jungquists rely, does not apply to Al–Malki's and Al Baba's performance of their official duties.[9] Under this exception, the term "commercial activity" is defined as "either a regular course of commercial conduct or a particular commercial transaction or act," and "[t]he commercial character of an activity [is] determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." 28

U.S.C. § 1603(d). As the Supreme Court has explained:

[T]he [relevant] question is not whether the foreign government is acting with a profit motive or instead with the aim of fulfilling uniquely sovereign objectives. Rather, the issue is whether the particular actions that the foreign state performs (whatever the motive behind them) are the type of actions by a which a private party engages in 'trade and traffic or commerce.'

*Saudi Arabia v. Nelson,* 507 U.S. 349, 360–61, 113 S.Ct. 1471, 1479, 123 L.Ed.2d 47 (1993) (quoting *Republic of Argentina v. Weltover,* 504 U.S. 607, 614, 112 S.Ct. 2160, 2166, 119 L.Ed.2d 394 (1992)); *see also Princz,* 26 F.3d at 1172.

The Jungquists' contention that Al–Malki's and Al Baba's actions in the District of Columbia constitute commercial activity under the FSIA is flawed. They point to Al–Malki's and Al Baba's meetings and telephone conferences with the Jungquists to arrange for Tara's medical treatment; their processing of the payments for Tara's medical services and Tara's and her mother's living expenses, the latter by making wire transfers to the Jungquists' bank account in the District of Columbia; and their service as liaison between the Jungquists and various doctors and hospitals. In support of the characterization of this conduct as commercial activity, the Jungquists rely on *Rush–Presbyterian,* 877 F.2d 574. There, the government of Greece had contracted with hospitals in the United States for medical services not widely available in Greece, and was sued by the hospitals for nonpayment for services rendered. *Id.* at 575. Rejecting Greece's contention that the contract was not commercial because it had been secured in order to fulfill the government's constitutional obligation to provide for the health of its

**8.** According to Al–Malki, Dr. Victoria Linda Zariff had responsibility for discussing the medical conditions of patients with the relevant physicians and doctors, and Al Baba's duties had "nothing to do with" the medical part of the program.

**9.** The district court did not reach the question of whether Al–Malki's and Al Baba's performance of their official duties constituted commercial activity within the meaning of the FSIA. The

Jungquists maintain that, if the court determines that the FSIA does apply, the case should be remanded to the district court for further discovery on this question. A remand is unnecessary, however, because the record is sufficiently developed to allow the court to resolve this issue as a matter of law. *See King v. C.I.R.,* 458 F.2d 245, 249 (6th Cir.1972); *see also* 9A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2577, at 522 (1995).

citizenry, the Seventh Circuit held that the essence of the contract, "the basic exchange of money for health care services," constituted commercial activity within the meaning of the FSIA. *Id.* at 581.

While the Abu Dhabi medical treatment program bears some resemblance to Greece's policy of providing medical care to its denizens, the Jungquists confuse general activity related to the claim with the specific activity upon which the claim is based. *See Nelson,* 507 U.S. at 358, 113 S.Ct. at 1478. In *Rush–Presbyterian,* the plaintiffs were medical service providers suing a foreign government for breach of contract for its failure to pay for services. 877 F.2d at 575. The Jungquists, by contrast, are suing Al–Malki and Al Baba for actions that are uniquely sovereign in nature and that were taken in their official capacities. The Jungquists entered no contractual relationship with Al–Malki and Al Baba. Rather, the two officials fulfilled Sheikh Sultan's obligations to the Jungquists by performing their official tasks as administrators of a government program to provide for the health and welfare of Abu Dhabi's citizens and residents. Al–Malki and Al Baba's actions are not those by which a private party engages in "'trade and traffic or commerce,'" and the fact that these actions may relate in certain respects to commercial activity does not provide a basis for jurisdiction under 28 U.S.C. § 1605(a)(2).[10] *Nelson,* 507 U.S. at 358, 113 S.Ct. at 1478.

## IV.

While the evidence of Sheikh Sultan's personal promise supported the district court's exercise of subject matter jurisdiction, the question remains whether the district court properly exercised personal jurisdiction over Sheikh Sultan and Samea.

In considering the Jungquist's contract, fraud, fraud in the inducement, civil conspiracy, and promissory estoppel claims, the district court concluded that appellants' contacts with the District of Columbia provided a sufficient basis for the exercise of personal jurisdiction under either the "transacting any business" prong or the "contracting to supply services" prong of the District of Columbia's Long Arm Statute, D.C.Code § 13–423(a)(1)–(a)(2),[11] and that this exercise of personal jurisdiction was consistent with the Due Process Clause. *Jungquist,* 940 F.Supp. at 320. The court relied on the allegations that the defendants contracted for the payment of medical expenses and compensation for injuries, and that this contract was partially performed in the District of Columbia where Tara was medically treated and she and her mother lived for several months at the defendants' expense, as well as allegations that their expenses were paid from District of Columbia bank accounts to the Jungquists' District of Columbia bank account and to the National Rehabilitation Hospital in the District of Columbia, and that one of Tara's treating physicians in the District of Columbia was contacted on behalf of the defendants in an attempt to get him to alter his medical diagnosis. *Id.* at 319. As to Sheikh Sultan specifically, the district court relied on the allegations that he conspired to perform acts in the District of Columbia in furtherance of the conspiracy to defraud the Jungquists,

**10.** In *Nelson,* the Court held that acts of detention and torture in Saudi Arabia could not give rise to jurisdiction in the United States. 507 U.S. at 358–61, 113 S.Ct. at 1478–79. Although Saudi Arabia's recruitment in the United States of the plaintiff and entry into an employment contract with him for work in a Saudi Arabian government hospital may have constituted commercial activity within the meaning of the FSIA, those actions did not form the basis of the plaintiff's suit. *Id.* at 358, 113 S.Ct. at 1478. Similarly, here, even if aspects of the Abu Dhabi foreign medical treatment program may be commercial, because the actions that form the basis of the Jungquists' claims against Al–Malki and Al Baba are not commercial in nature, the district court did not have subject matter jurisdiction over the claims against Al–Malki and Al Baba under the commercial activities exception to the FSIA.

**11.** D.C.Code § 13–423 provides in relevant part:

(a) A District of Columbia court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a claim for relief arising from the person's—

(1) transacting any business in the District of Columbia;

(2) contracting to supply services in the District of Columbia;

(b) When jurisdiction over a person is based solely upon this section, only a claim for relief arising from acts enumerated in this section may be asserted against him.

contracted with them to provide medical treatment in the District of Columbia, and caused his agents to perform part of the contract, to contact one of Tara's treating physicians to influence his diagnosis, and to breach the contract in the District of Columbia. *Id.* at 320.

Appellants challenge each ground relied on by the district court for the exercise of personal jurisdiction over them. Noting that Sheikh Sultan and Samea were never physically present in the District of Columbia during the relevant time period and did not personally perform any acts here, appellants maintain that the district court · could not exercise jurisdiction under a conspiracy theory because the conclusory allegations in the complaint fail to plead conspiracy with the requisite degree of particularity. They further contend that neither the "transacting any business" nor "contracting to supply services" prong of the District of Columbia's long-arm statute provides a basis for personal jurisdiction. They point out that the complaint alleges that the promises were made in Abu Dhabi and Germany, not the District of Columbia, and that there is no allegation or proof that Sheikh Sultan, either alone or through his agents, promised to compensate the Jungquists in or through the District of Columbia or transacted any business here from which the Jungquists' causes of actions could arise. In addition, appellants maintain that there is no allegation or proof that any appellant purposely contracted to provide services to Tara in the District of Columbia; rather, Tara's treatment in the District of Columbia occurred not pursuant to an agreement with any appellant, but as a result of the advice of medical authorities in Abu Dhabi and at Johns Hopkins University in Baltimore, Maryland. Thus, appellants contend, the fact that Tara's medical treatment fortuitously occurred in the District of Columbia does not provide sufficient contacts between appellants and the District of Columbia to allow the district court to assert personal jurisdiction consistent with due process.

■■■ We agree that the district court could not, consistent with due process, exercise personal jurisdiction over Sheikh Sultan and Samea. First, personal jurisdiction is unavailable here under a conspiracy theory. The complaint alleged that Sheikh Sultan and Samea engaged in purposeful and consistent contacts with the District of Columbia through the overt acts of their co-conspirators. But "[b]ald speculation" or a "conclusionary statement" that individuals· are co-conspirators is insufficient to establish personal jurisdiction under a conspiracy theory. *Naartex Consulting Corp. v. Watt,* 722 F.2d 779, 787 (D.C.Cir.1983), *cert. denied,* 467 U.S. 1210, 104 S.Ct. 2399, 81 L.Ed.2d 355 (1984). Instead, the plaintiff must plead with particularity "the conspiracy as well as the overt acts within the forum taken in furtherance of the conspiracy." *Dooley v. United Technologies Corp.,* 786 F.Supp. 65, 78 (D.D.C.1992) (citing *Naartex,* 722 F.2d at 787 and *First Chicago Int'l v. United Exchange Co., Ltd.,* 836 F.2d 1375, 1378–79 (D.C.Cir.1988)). The Jungquists have not done so. The only actions alleged to have occurred in the District of Columbia were by Al–Malki and Al Baba. But, their alleged actions in furtherance of the conspiracy either fell within their official duties or were without support in the evidence. *See supra* Part III. Thus, the Jungquists failed to plead with sufficient particularity any overt acts within the District of Columbia in furtherance of the conspiracy, and personal jurisdiction over Sheikh Sultan and Samea is unavailable under a conspiracy theory.

■■■ Second, absent personal jurisdiction under a conspiracy theory, the district court. could not, consistent with the constitutional requirements of due process, properly assert jurisdiction over Sheikh Sultan and Samea under the District of Columbia long-arm statute. The district court may exercise personal jurisdiction over the defendant only if "there are 'minimum contacts' between the defendant and the forum 'such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.' " *United States v. Ferrara,* 54 F.3d 825, 828 (D.C.Cir.1995) (quoting *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945)). While the defendant's absence of physical contact with a forum will not defeat personal jurisdiction there, *Burger King Corp. v. Rudzew-*

*icz,* 471 U.S. 462, 476, 105 S.Ct. 2174, 2184, 85 L.Ed.2d 528 (1985), "the defendant's conduct and connection with the forum State [must be] such that he should reasonably anticipate being haled into court there." *Ferrara,* 54 F.3d at 828 (quoting *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980)). The Jungquists failed to offer evidence that Sheikh Sultan and Samea had the requisite "minimum contacts" with the District of Columbia. *See Ferrara,* 54 F.3d at 828 (quoting *International Shoe,* 326 U.S. at 316, 66 S.Ct. at 158).

It is undisputed that at the time of contracting Sheikh Sultan did not originally promise that the contract would be performed in the District of Columbia. While he subsequently authorized Tara's transfer to the United States for treatment, there is no evidence that Sheikh Sultan knowingly authorized her treatment in the District of Columbia. The only evidence that Sheikh Sultan knew of Tara's treatment here appears in Michelle Jungquist's affidavit, where she states that in March 1994 in response to her complaints about the reduction in Tara and her mother's housing and subsistence allowance in the District of Columbia, Sheikh Sultan reaffirmed his promise to pay for Tara's medical expenses and injuries. There is no evidence, however, and the Jungquists do not allege, that Sheikh Sultan ever took any specific action pursuant to that reaffirmation. Nor do they point to any evidence that Samea arranged for or was connected with Tara's treatment in the District of Columbia. In short, there is no evidence that either Sheikh Sultan or Samea purposefully directed his efforts toward the District of Columbia or availed himself of the privilege of conducting business here. *See, e.g., Travelers Health Ass'n v. Virginia,* 339 U.S. 643, 648–49, 70 S.Ct. 927, 930, 94 L.Ed. 1154 (1950).

Under the circumstances, neither appellant could have reasonably anticipated being haled into court in the District of Columbia, and the district court therefore lacked personal jurisdiction over them. *See World–Wide Volkswagen,* 444 U.S. at 297, 100 S.Ct. at 567.

■ Likewise, the district court could not exercise personal jurisdiction over Sheikh Sultan for the remaining tort claims alleged against him. *See* D.C.CODE ANN. § 13–423. The Sheikh's amenability to suit must be determined by reference to the District of Columbia's long-arm statute, which confers not general jurisdiction, but personal jurisdiction specific to the claims arising out of actions related to the District of Columbia.[12] D.C.CODE ANN. § 13–423(b), quoted *supra* note 11; *see El–Fadl,* 75 F.3d at 672; *Koteen,* 913 F.2d at 974–75. The only relevant provision of the long-arm statute provides for personal jurisdiction over claims arising from the defendant's "causing tortious injury in the District of Columbia by an act or omission in the District of Columbia." *See* D.C.CODE ANN. § 13–423(a)(3). Because the tort claims against the Sheikh for negligence, negligent entrustment, loss of filial consortium, and loss of services do not arise out of any act in the District of Columbia, but from the boating accident in Abu Dhabi, the district court did not have personal jurisdiction over him as to these claims. While the complaint alleged some actions by the Sheikh's agents in the District of Columbia related to the claim for intentional infliction of emotional distress, namely, the repeated intentional misrepresentations of the Sheikh's intention fully to compensate the Jungquists for Tara's injuries, there is no evidence that the Sheikh authorized, intended, or even knew of, the performance of these actions in the District of Columbia, and hence, even if this claim fell within the long-arm statute, the exercise of

---

12. The district court erred in ruling that it could exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over these claims. *Jungquist,* 940 F.Supp. at 320–21. Subject matter jurisdiction was established by reason of diversity of citizenship. *Id.* at 316; 28 U.S.C. § 1332. Hence, there was no need to exercise 'supplemental' subject matter jurisdiction under § 1367(a). Section 1367(a) does not apply to questions of personal jurisdiction, and the two cases cited by the district court are inapposite: *Wiggins v. Philip Morris, Inc.,* 853 F.Supp. 458, 469 (D.D.C.1994), involved the exercise of subject matter jurisdiction, not personal jurisdiction, over supplemental claims, and *Gibbons v. Udaras na Gaeltachta,* 549 F.Supp. 1094, 1116 (S.D.N.Y.), concerned the exercise of personal jurisdiction where subject matter jurisdiction was based on the FSIA, not diversity of citizenship.

personal jurisdiction would be inconsistent with due process. *See World–Wide Volkswagen,* 444 U.S. at 294, 100 S.Ct. at 565; *Travelers Health Ass'n,* 339 U.S. at 648–49, 70 S.Ct. at 930.

Accordingly, we reverse insofar as the district court's order denies appellants' motion to dismiss the complaint.