**MILLEN INDUSTRIES, INC., et al., Appellants,**

v.

**COORDINATION COUNCIL FOR NORTH AMERICAN AFFAIRS.**

**No. 87–7075.**

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 25, 1988.

Decided Aug. 30, 1988.

Judith Richards Hope, with whom Bruce D. Ryan, John F. Sherlock, III, and Robert L. Muse, Washington, D.C., were on the brief, for appellants.

Thomas G. Corcoran, Jr., Washington, D.C., for appellee.

John P. Schnitker, Atty., Dept. of Justice, with whom Richard K. Willard, Asst. Atty. Gen., Joseph E. diGenova, U.S. Atty., and Michael Jay Singer, Atty., Dept. of Justice, Washington, D.C., were on the brief, for amicus curiae, U.S.

Before EDWARDS [*], BUCKLEY and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge SENTELLE.

SENTELLE, Circuit Judge:

This is an appeal from an order of the District Court dismissing plaintiff's complaint because it failed to state claims upon which relief can be granted and, alternatively, because its claims are barred by the act of state doctrine. Since it appears that the District Court and this Court may lack jurisdiction, we remand for further proceedings to determine the jurisdictional questions.

## I. BACKGROUND

This action arose out of the attempt of plaintiff-appellant Millen Industries, Inc. (Millen) [1] to establish and operate a shoe box manufacturing plant in Taiwan. According to the allegations of its amended complaint, which we take as true for purposes of this appeal, *Doe v. United States Dep't of Justice*, 753 F.2d 1092, 1102 (D.C. Cir.1985), defendant-appellee Coordination Council for North American Affairs (CCNAA), an instrumentality of the people of Taiwan, acted as "public relations agent and broker" for Taiwan in soliciting United States citizens to establish commercial ventures in Taiwan. As agent for Taiwan, CCNAA made authorized representations to Millen and agreed with Millen that Millen could locate a shoe box manufacturing plant anywhere on Taiwan, could ship to local shoe manufacturers, could import raw materials on a duty-free basis provided the raw materials were subsequently exported as finished shoe boxes containing shoes made in Taiwan, and that plaintiff's raw material imports would receive "easy ac-

---

[*] Circuit Judge Edwards was a member of the panel at the time this case was argued but found it necessary to recuse from the case and did not participate in this opinion.

1. References to Millen include, when appropriate in context, seven named individuals who are also plaintiffs and appellants herein.

cess through Taiwanese customs," provided Millen established a completely export-oriented factory to produce high-quality packaging for Taiwan's footwear export trade. CCNAA promised Millen only the benefit of existing Taiwanese law, not any special concession or benefit that was not available to similarly qualified investors.

The complaint further alleges that, in reliance on these representations and promises, Millen organized a Taiwanese corporation, leased machinery to it, obtained all necessary approvals and licenses, and, in late 1983, commenced operations in Taiwan. From the beginning, however, Taiwan obstructed Millen's importation of machinery and raw materials and soon thereafter cancelled all duty-free importation of raw materials subsequently exported as finished goods. CCNAA knew that cancellation of duty-free treatment was "under consideration" by Taiwan when CCNAA made representations about the availability of such treatment, although those statements were "true when made." As a result of Taiwan's actions, Millen's Taiwan plant operated at a loss and closed in 1985. Taiwan has refused to permit Millen to withdraw its machinery and raw materials, and CCNAA "has acquiesced in this refusal."

Millen sought relief in the District Court based on breach of contract, "detrimental reliance," misrepresentation, and conversion.[2] The District Court dismissed the contract claim because the claim alleged promises relating directly to "uniquely sovereign" import-export activity and, therefore, was barred by the act of state doctrine. The District Court held, alternatively, that the complaint alleged no promises at all and, therefore, alleged no contract. The District Court based this conclusion on Paragraph 36 of Millen's First Amended Complaint, which reads: "All promises made to Plaintiffs by Defendant were promises that they would enjoy the benefits of existing law. Plaintiffs were promised no special concessions or benefits not available to other qualified prospective investors." The District Court dismissed the claim for detrimental reliance, which the District Court rechristened "promissory estoppel," on the same act of state grounds as it had dismissed the contract claim and dismissed the misrepresentation and conversion claims alternatively on act of state grounds and for failure to state a claim. This appeal followed.

## II. ACT OF STATE DOCTRINE

The United States entered this case as amicus curiae at the appellate stage pursuant to 28 U.S.C. § 517 (1982), which authorizes the Attorney General to "attend to the interests of the United States in a suit pending in a court of the United States." In the present litigation, this interest is triggered by the lower court's application of "act of state" doctrine and its failure to invoke the jurisdictional provisions of the Foreign Sovereign Immunities Act, 28 U.S. C. §§ 1330, 1602–1611 (1982) (FSIA or Act). While we have previously recognized that a principal purpose of the FSIA was to settle responsibility in the courts rather than the Executive for determining the jurisdiction of United States courts over foreign sovereigns, the foreign policy implications of the application of that Act obviously occasion a continuing involvement by the Executive. *See Practical Concepts, Inc. v. Republic of Bolivia,* 811 F.2d 1543, 1552 n. 21 (D.C. Cir.1987) (citing Letter from the Legal Adviser of the State Department to the Attorney General (Nov. 10, 1976), 75 Dep't St. Bull. 649–50 (1976)). For the same reason, the courts recognize the value of obtaining views of the Executive Branch in matters relating to the application of the act of state doctrine and giving appropriate weight to those views. *First National City Bank v. Banco Nacional de Cuba,* 406 U.S. 759, 765–70, 92 S.Ct. 1808, 1812–14, 32 L.Ed.2d 466 (1972) (plurality). While we will further discuss the FSIA in Section III, *infra,* an initial understanding of the District Court's use of the act of state doctrine and its implications is necessary to

---

**2.** Millen also sought relief under 19 U.S.C. § 2462, but has abandoned its appeal of the

District Court's dismissal of that claim.

the development of this opinion, as the amicus United States has suggested.

■ Although the United States does not "take a formal position ... at this time," Brief for the United States as Amicus Curiae at 22, on whether the act of state doctrine applies to the present case, its counsel has "been informed by the Department of State, however, that—putting to one side whatever generalized considerations of international comity and separation of powers may underlie the act of state doctrine where it is found applicable—there are no foreign policy interests of the United States in our present relations in the Far East that should bar adjudication of the present suit." *Id.* at n. 22. The act of state doctrine is grounded in concerns that "application of customary principles of law to judge the acts of a foreign sovereign might frustrate the conduct of foreign relations by the political branches of the government." *First National City Bank*, 406 U.S. at 767–68, 92 S.Ct. at 1813–14. That doctrine mandates that "generally the courts of one nation will not sit in judgment on the acts of another nation within its own territory...." *Id.* at 761, 92 S.Ct. at 1810. The doctrine applies with reference to Taiwan even though the United States does not recognize that government. In the Taiwan Relations Act (TRA), Congress specified that "[w]henever the laws of the United States refer or relate to foreign countries, nations, states, governments, or similar entities, such terms shall include and such laws shall apply with respect to Taiwan." 22 U.S.C. § 3303(b)(1) (1982). It appears to us that, given the plainly expressed intent of Congress in the TRA and the strong similarity between this doctrine and the FSIA, there can be no question that the act of state doctrine applies to Taiwan as fully as if Taiwan were recognized by this country.[3]

The District Court, rightly noting that the claims asserted by plaintiff relate primarily to acts done in Taiwan by the Taiwanese government, dismissed a portion of the claims pursuant to that doctrine. However, a further development of the jurisdictional facts may establish that neither the District Court nor this Court have jurisdiction under the FSIA to pass on Millen's claims at all. Obviously if after the limited fact finding necessary to determine the jurisdictional facts it appears that there is no subject matter jurisdiction, then neither the act of state question nor any questions relating to the adequacy of the claims need be reached.

Even if jurisdiction is found, our holding may require a recasting of the complaint, which may affect the analysis under the act of state doctrine. It may further appear either at summary judgment or trial stage that the facts alluded to by the amicus curiae may bring this case, if jurisdiction exists at all, within an exception to the act of state doctrine arising from *Bernstein v. N.V. Nederlandsche—Amerikaansche Stoomvaart—Maatschappij*, 210 F.2d 375 (2d Cir.1954) (per curiam). That exception, as applied by the courts of the Second Circuit, counsels that "as a matter of principle where the Executive publicly advises the Court that the act of state doctrine need not be applied, the Court should proceed to examine the legal issues raised by the act of a foreign sovereign within its own territory as it would any other legal question before it." *First National City Bank*, 406 U.S. at 764, 92 S.Ct. at 1811. The *Bernstein* exception was adopted by a plurality but not a majority of the Supreme Court in *First National City Bank v. Banco Nacional de Cuba*.[4] The necessity for that further development of the facts coupled with the uncertainty of the status of the *Bernstein* exception further counsels the remand for development

---

**3.** See further discussion in Section III, *infra.*

**4.** 406 U.S. 759, 92 S.Ct. 1808, 32 L.Ed.2d 466 (1972). Then Justice (now Chief Justice) Rehnquist announced the judgment of the Court in an opinion in which then Chief Justice Burger and Justice White joined. *Id.* at 760, 92 S.Ct. at

1810. Justices Douglas and Powell concurred in separate opinions on other grounds, not only declining to adopt but, indeed, expressly rejecting the *Bernstein* exception. *Id.* at 770–73, 92 S.Ct. at 1814–16 (Douglas, J., concurring), 773–76, 92 S.Ct. at 1816–17 (Powell, J., concurring).

of the jurisdictional question which we will hereinafter discuss.

### III. JURISDICTION

█ In holding that it had jurisdiction over this cause, the District Court relied on the alienage theory set forth in 28 U.S.C. § 1332(a)(2) (1982), which establishes jurisdiction over "... all civil actions where the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, and is between ... citizens of a State and citizens or subjects of a foreign state...." The District Court reached this conclusion based on plaintiff's jurisdictional allegation that "Defendant is an association comprised of subjects of the Republic of China." On its face this allegation would appear to support the conclusion of the District Court. Particularly is this true in light of the previously cited language of 22 U.S.C. § 3303(b)(1), that the terms "foreign countries, nations, states, governments, or similar entities" include Taiwan. However, the unique relationship between Taiwan and the United States compels a different treatment. At the time the United States withdrew recognition from the Taiwanese government and extended the special relations to Taiwan created by the TRA, Congress expressly provided that

> (2) the term "Taiwan" includes, as the context may require, the islands of Taiwan and the Pescadores, the people on those islands, corporations and other entities and associations created or organized under the laws applied on those islands, and the governing authorities on Taiwan recognized by the United States as the Republic of China prior to January 1, 1979, and any successor governing authorities (including political subdivisions, agencies, and instrumentalities thereof).

22 U.S.C. § 3314(2) (1982).

These sections must also be construed in light of a gloss added by 22 U.S.C. § 3309 which provides for the establishment of an "instrumentality" by Taiwan which "the President determines has the necessary authority under the laws applied by the people on Taiwan to provide assurances and take other actions on behalf of Taiwan in accordance with this chapter."

The CCNAA is an "instrumentality" established by Taiwan. As the language of the quoted section reveals, the President is empowered to recognize such an instrumentality and extend to it and its appropriate personnel necessary privileges and immunities. Subsequently, the President delegated this authority to the Secretary of State. Exec. Order No. 12143, § 1–101, 3 C.F.R. 402 (1980), *reprinted in* 22 U.S.C. § 3301 note at 662 (1982). Thereafter, the State Department, pursuant to the Secretary's delegated authority, entered into contract with the American Institute in Taiwan (AIT) pursuant to 22 U.S.C. § 3305 authorizing it to "carry out, on an unofficial basis, programs, transactions, and other relations with or relating to the people on Taiwan," and to "perform and enforce existing international and other agreements and arrangements between the Government or any department or agency thereof and the people on Taiwan," and to "[o]therwise represent the United States and the American people, and carry out functions on their behalf ... with respect to the people of Taiwan." Contract between Department of State and The American Institute in Taiwan, Schedule, Article I (Apr. 12, 1979) (Contract No. 2013–900101). AIT, at the direction of the Department of State, entered into an agreement with the CCNAA which recognizes the CCNAA as to the Taiwanese counterpart agency. Therefore, shortly put, the CCNAA for purposes of this action, rather than being a subject or citizen of Taiwan, *is* Taiwan.

As all laws, including the FSIA, applicable to nations also apply to Taiwan, 22 U.S.C. §§ 3303(b)(1), 3314(1); S.Rep. No. 7, 96th Cong., 1st Sess. 23 (1979), 1979 U.S. Code Cong. & Admin.News 36, 58, (specifically referring to FSIA), CCNAA enjoys the same immunity under the FSIA as do other nations.[5] And because the FSIA is

---

5. We recognize, as suggested by defendants, that another argument for immunity exists. The agreement between the AIT and CCNAA provided for immunity "equivalent to [that] enjoyed by public international organizations in the United States." As we previously noted in *Broadbent v.*

the exclusive means of exercising jurisdiction over the foreign sovereigns, *MacArthur Area Citizens Ass'n v. Republic of Peru*, 809 F.2d 918, 919 (D.C.Cir.1987) (quoting H.R.Rep. No. 1487, 94th Cong., 2d Sess. 12 (1976)), 1976 U.S.Code Cong. & Admin.News 6604, 6610, the District Court erred in premising jurisdiction on the alienage diversity statute.

■ The FSIA in 28 U.S.C. § 1604 provides a general rule that "foreign state[s] [are] immune from the jurisdiction of the courts of the United States . . .," subject to specified exceptions. 28 U.S.C. § 1604. The only exception at issue here is the so-called "commercial activity exception." This exception provides that

> A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case—
>
> .     .     .     .     .
>
> (2) in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States. . . .

*Id.* § 1605(a)(2). Obviously then the applicability of this exception is dependent upon the presence of "commercial activity." Commercial activity is defined as

> either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by

reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose. *Id.* § 1603(d). While making it clear that the commercial or governmental character of an activity depends upon its nature and not its purpose, the FSIA does not further distinguish between the two, leaving it to the courts to refine the distinction. *Practical Concepts*, 811 F.2d at 1549.[6] A useful inquiry in pursuing this refinement is whether the essence or central elements of an agreement made by a foreign state " 'might be made by a private person.' " *Id.* at 1550 (quoting H.R.Rep. No. 1487, 94th Cong., 2d Sess. 16 (1976), *reprinted in* 1976 U.S. Code Cong. & Admin.News 6604, 6615). It is this test that we must apply to the complaint before the District Court.

*Practical Concepts* involved the breach of a technical assistance and consulting services contract between Practical Concepts, Inc. (PCI), an American company, and the Republic of Bolivia. The contract involved a three-year, comprehensive program of development of Bolivia's rural areas. Although the only contracting parties were PCI and Bolivia, the United States Agency for International Development (AID) was to provide the funding. After AID cut off the funds, Bolivia cancelled the contract. PCI sued in U.S. federal court, and we held that the District Court should have exercised jurisdiction under the FSIA because the claim was based on Bolivia's commercial activity. The District Court had reached the opposite conclusion, relying on certain terms in the PCI–Bolivia contract that only a government could perform:

> First, Bolivia exempted PCI employees dispatched to work on the contract in

---

*Organization of American States*, 628 F.2d 27, 30–33 (D.C.Cir.1980), arguments exist for an immunity under the International Organizations Immunities Act, Pub.L. No. 79–291; Tit. I, 59 Stat. 669 (1945) (IOIA), 22 U.S.C. § 288a(b) (1982), exceeding that offered under the FSIA. However, since we hold the FSIA to be applicable to the CCNAA, we need not reach the question left open in *Broadbent*.

**6.** In identifying this role for the courts, this Circuit and others have relied on specific legislative history. "Congress deliberately left the

meaning open and . . . 'put [its] faith in the U.S. Courts to work out progressively, on a case-by-case basis . . . the distinction between commercial and governmental.' " *Texas Trading & Milling Corp. v. Federal Republic of Nigeria*, 647 F.2d 300, 308–09 (2d Cir.1981) (quoting *Hearings on H.R. 11315 Before the Subcommittee on Administrative Law and Governmental Relations of the House Committee on the Judiciary*, 94th Cong., 2d Sess. 53 (1976) (testimony of Monroe Leigh, Legal Advisor, Department of State)).

Bolivia from certain taxes. Bolivia also undertook to expedite bureaucratic processes for entering and leaving the country. In addition, Bolivia promised not to object if the United States chose to grant PCI diplomatic privileges.

811 F.2d at 1549–50 (citations to record omitted). This Court reversed because these terms were not essential to the nature of the transaction:

But the legislature, so far as we can tell, did not intend that the "character" of a contract would turn on its subsidiary rather than its central prescriptions. The essence of the Bolivia–PCI contract plainly was the exchange of money for advice on the development of rural areas. Prompt provision of documents to facilitate entry of material and personnel and tax exemptions to simplify PCI's receipt of payments from Bolivia, just as plainly, were auxiliary to the basic exchange.

*Id.* (footnotes omitted). According to *Practical Concepts,* a foreign sovereign may be subject to suit even when the transaction at issue could not have been entered into *in its entirety* by a private party, *provided* the "sovereign" elements of the contract were auxiliary to the essentially commercial character of the transaction. The Court reserved the question of the application of the commercial activity exception to a mixed sovereign-commercial transaction when the claim is *based* on a sovereign element:

This case does not present the issue whether a foreign state would be entitled to sovereign immunity in an action *based on* an incidental (performance-facilitating) contract term that only a government could offer and perform. That issue would arise, for example, if a foreign nation were sued for failing to grant a tax exemption it had promised in a contract for the sale of goods. We express no opinion on such a case.

811 F.2d at 1548 n. 9 (emphasis in original); *see also id.* at 1550 n. 15.

We now decide that when a transaction partakes of both commercial and sovereign elements, jurisdiction under the FSIA will turn on which element the cause of action is based on. Even if a transaction is partly commercial, jurisdiction will not obtain if the cause of action is based on a sovereign activity.

■ The transaction between Millen and CCNAA involved both sovereign and commercial elements. Promotion of investment is ordinarily a commercial activity; private parties commonly act as public relations agents. *Cf. Tucker v. Whitaker Travel, Ltd.,* 620 F.Supp. 578, 584 (E.D.Pa. 1985), *aff'd,* 800 F.2d 1140 (3d Cir.), *cert. denied,* 479 U.S. 987, 107 S.Ct. 578, 93 L.Ed.2d 581 (1986); *Gibbons v. Udaras na Gaeltachta,* 549 F.Supp. 1094, 1110–11 (S.D.N.Y.1982). On the other hand, the "right to regulate imports and exports [is] a sovereign prerogative." *MOL, Inc. v. Peoples Republic of Bangladesh,* 736 F.2d 1326, 1329 (9th Cir.1984). Thus, to the extent that the causes of action are based on promises, breaches of promises, and other allegedly actionable conduct involving extending duty-free status and/or the benefit of Taiwanese law, these would plainly be sovereign aspects of the transaction over which we lack jurisdiction.

■ One allegation of the complaint, however, may be sufficient to create jurisdiction. Generously read, the allegation that defendant promised plaintiff that they "would receive easy access ... for imported machinery and equipment," could refer to not the essentially governmental activities of customs agents but rather the commercial activity of a commercial "customs expediter." Therefore, the potential exists that claims based on the breach of that promise encompassed within the plaintiff's complaint for breach of contract and promissory estoppel fall within the commercial activity exception and, therefore, should not be dismissed on jurisdictional grounds. Since, as discussed in Section II, *supra,* the act of state doctrine relied on by the District Court should not be reached if this case is in fact beyond the proper jurisdiction of that Court by reason of the FSIA, we now accept the suggestion of amicus curiae United States and remand those

claims for further development of the jurisdictional facts.[7]

## IV. CONCLUSION

As noted above, the District Court's dismissal of the complaint was based in part on the failure to state claims upon which relief could be granted. Since further analysis of the jurisdictional facts may determine that neither the District Court nor this Court has jurisdiction to pass on those claims, we will not now express any opinion on their adequacy. We will instead remand for further development of the jurisdiction- al facts and determination of the jurisdictional question. Should the District Court determine that jurisdiction does exist under the FSIA, the matter will then be ripe for further proceedings.

VACATED AND REMANDED.

---

7. Whether this development is done by way of summary judgment procedures or in some other procedural fashion we leave to the sound discre- tion of the District Court and the litigation strategy of the parties.