# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued December 5, 2005        Decided July 7, 2006

No. 05-7030

YANG RONG, *ET AL.*,
APPELLANTS

v.

LIAONING PROVINCE GOVERNMENT,
A SUBDIVISION OF THE PEOPLE'S REPUBLIC OF CHINA,
A FOREIGN STATE,
APPELLEE

---

Appeal from the United States District Court
for the District of Columbia
(No. 03cv01687)

---

*Bert W. Rein* argued the cause for the appellants. *Charles O. Verrill, Jr., John A. Hodges, Thomas W. Queen* and *M. Evan Corcoran* were on brief.

*Craig A. Hoover* argued the cause for the appellee. *Jonathan S. Franklin, Christopher T. Handman* and *Jessica L. Ellsworth* were on brief.

Before: HENDERSON, ROGERS and TATEL, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* HENDERSON.

Concurring opinion filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: Appellants Yang Rong, Rhea Yeung and the Broadsino Finance Company, a limited company controlled by Yang Rong and incorporated in Hong Kong, appeal the district court's dismissal of their complaint brought under the Foreign Sovereign Immunities Act (FSIA or Act), 28 U.S.C. §§ 1602 *et seq.*, against Liaoning Province (Province), a subdivision of China, for lack of subject matter jurisdiction. On appeal Yang Rong,[1] a Chinese national and permanent resident of the United States, and his fellow appellants argue that the district court erroneously found that the Province's challenged act was insulated from suit by sovereign immunity. He claims jurisdiction exists under the "commercial activity" exception set out in section 1605(a)(2) of FSIA, which provides that an action does lie against a foreign state if it is based "upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States." *Id.* § 1605(a)(2). We conclude that the "commercial activity" exception is inapplicable to the Province's act and that instead its action was quintessentially sovereign. Accordingly, we affirm the district court's dismissal of the complaint.

I.

In 1991 Rong and the municipality of Shen Yang, a city in the Liaoning Province in northeast China, entered into a joint venture for automobile production.[2] The principal

---

[1] In discussing the facts in Part I, "Rong" refers to Yang Rong. In Part II, however, "Rong" refers to all three appellants.

[2] We take the facts from Rong's complaint, assume them to be true and draw all plausible inferences in his favor. *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 93 (D.C. Cir. 2002).

partners in the venture, called Shen Yang Jin Bei Passenger Vehicle Manufacturing Company, Ltd. (Shen Yang Automotive), were the Broadsino Finance Company (Broadsino), a Hong Kong-incorporated company wholly owned by Yang Rong, and Jin Bei Automotive Shareholding Company, Ltd. (Jin Bei Shareholding), a corporation owned by the Shen Yang municipal government. At the venture's inception Jin Bei Shareholding owned 60 per cent of Shen Yang Automotive, Broadsino owned 25 per cent and another partner, Hainen Huayin International Trust Investment Company (Hainen), owned 15 per cent. Broadsino subsequently acquired Hainen's shares to effect a 60/40 ownership split in Shen Yang Automotive, that is, Jin Bei Shareholding had 60 per cent ownership and Broadsino had 40 per cent ownership. Compl. ¶ 19, reprinted in Joint Appendix (JA) 12.

To expand the venture through access to American capital the partners sought to list Shen Yang Automotive on the New York Stock Exchange (NYSE). Yang Rong, who served as Shen Yang Automotive's chief executive and manager, incorporated Brilliance Holdings Limited (Brilliance Holdings) in Bermuda as the financing vehicle to obtain a listing on the NYSE and transferred his 40 per cent ownership interest to Brilliance Holdings. Jin Bei Shareholding also transferred 11 per cent of its interest in Shen Yang Automotive to Brilliance Holdings, thereby giving the Bermuda-based company a 51 per cent interest in Shen Yang Automotive. In return for transferring 11 per cent of its interest, Jin Bei Shareholding received 21.57 per cent of Brilliance Holdings stock, thereby reducing Rong's interest in Brilliance Holdings to the remaining 78.43 per cent of its stock. Compl. ¶ 20, JA 12. In registering the stock with the Securities and Exchange Commission (SEC), preparing the initial public offering in the United States and listing the stock

on the NYSE, senior Chinese government officials informed Rong that a Chinese entity rather than a Hong Kong private company should be the majority shareholder of the listed company inasmuch as the U.S. registration and listing would be the first for a China-based company in 50 years. Rong understood that the Chinese authorities would be satisfied if the majority interest in the listed company was held in the name of a Chinese non-governmental organization (NGO). 1st Am. Compl. ¶ 3, JA 24. Consequently in May 1992, Broadsino, the People's Bank of China and other Chinese governmental entities created the Chinese Financial Educational Development Foundation (Foundation), an NGO. Shang Ming, the deputy governor of the People's Bank of China (Ming), served as the Foundation's chairman while Rong served as vice chairman.

In September 1992, Broadsino transferred its Brilliance Holdings stock to the Foundation. Eventually, Rong and Ming agreed "that the Foundation would hold the shares in trust for Broadsino, in effect acting as the nominee for Broadsino," and that Rong was to have sole authority to manage, control and administer the Foundation's equity interest in Brilliance Holdings. 1st Am. Compl. ¶ 28, JA 32-33. The transferred Brilliance Holdings shares were held in the Foundation's name. As a result of this arrangement, as well as the sale of 28.75 per cent of Brilliance Holdings shares in October 2002, the Foundation held 55.88 per cent of the Brilliance Holdings shares and Jin Bei Shareholding held 15.37 per cent. 1st Am. Compl. ¶ 30, JA 34. At Rong's direction, Broadsino paid the costs to register and list the Brilliance Holdings stock and paid various administrative fees to the Foundation. He also managed and directed Brilliance Holdings' primary holding, Shen Yang Automotive, arranging with Toyota and General Motors to manufacture automobiles for those companies. All of Shen Yang Automotive's

manufacturing facilities were located in Liaoning Province.

Meanwhile, in early 2002 the Province formed a "Working Committee," headed by the Assistant to the Governor of the Province. In March 2002 the Working Committee declared that all equity interests held in the name of the Foundation, including Rong's interest in Brilliance Holdings, were state assets and demanded that he transfer them to the Province. Compl. ¶ 28–29, JA 14–15. After Rong refused, the Working Committee informed Rong and the Brilliance Holdings board of directors that the Foundation no longer recognized Broadsino's beneficial interest in Brilliance Holdings. At the direction of the Province, the Brilliance Holdings board dismissed Rong as President, CEO and Director and placed Working Committee members in those positions and other management positions. In October 2002 the newly installed Brilliance Holdings board ceased paying Rong a salary, dismissed him as a director the next month and terminated his contract. The Province also formed Huachen Automotive Group Holdings Company Limited (Huachen) and appointed Province officials as officers of the new company. Approximately two months later Huachen purchased the Brilliance Holdings shares nominally held by the Foundation in trust for Broadsino for $18 million, about six per cent of market price. Huachen and the Brilliance Holdings board also made a tender offer for the remaining Brilliance Holdings shares, including those traded on the NYSE, resulting in the suspension of trading of Brilliance Holdings shares on the NYSE from December 18 to December 19, 2002. Compl. ¶ 35, JA 17.

As the Working Committee was executing the takeover,

Rong, acting for Broadsino, sought relief in various courts.[3] Broadsino initiated proceedings against the Foundation in the Beijing Municipal High Court seeking a determination of its interest in the assets nominally held by the Foundation, including the Brilliance Holdings stock the Foundation held in trust, but was rebuffed. 1st Am. Compl ¶ 38, JA 38. Rong also filed a complaint against the Province in the District of Columbia district court, challenging the Province's "implementation of the scheme to take Plaintiffs' shares, other equity interests, and other property and then to maintain control thereof for its own commercial benefit" under FSIA. 1st Am. Compl. ¶ 14, JA 27. The Province moved to dismiss for lack of subject matter jurisdiction, asserting that neither FSIA's commercial activity exception, 28 U.S.C. § 1605(a)(2), nor its expropriation exception, *id.* § 1605(a)(3),

---

[3]Although the history of the litigation is not set forth in Rong's complaint, Broadsino also brought a lawsuit in Bermuda against Brilliance Holdings, four Brilliance Holdings board members, the Foundation and Huachen to block the stock transfer from the Foundation to Huachen. The Bermuda court refused to enjoin the transfer and on appeal the Bermuda Supreme Court ruled that Broadsino "never owned any shares in [Brilliance Holdings]" and therefore concluded that it was "an abuse of the process of the Court to pursue a claim that [Broadsino] transferred any shares" in Brilliance Holdings to the Foundation. *Broadsino Fin. Co. v. Brilliance China Auto. Holdings Ltd.* (Sup. Ct. of Berm., Dec. 31, 2003), JA 116. In 2005, the Court of Appeal for Bermuda affirmed, concluding that Broadsino had no beneficial interest in Brilliance Holdings stock and the Foundation, by extension, held no Brilliance Holdings stock in trust for Broadsino. It also found that Brilliance Holdings had paid Broadsino for the latter's interest in Shen Yang Automotive. *See Broadsino Fin. Co. v. Brilliance China Auto. Holdings Ltd.*, (Berm. Ct. App., Mar. 14, 2005), Appellee's Br. Addendum 1, 7.

applied.[4]  JA 50.  The district court agreed, holding that the Province's acquisition of the Brilliance Holdings shares was a sovereign act and the Province was therefore immune from suit.  It dismissed the action under Rule 12(b)(1) of the Federal Rules of Civil Procedure.  *Yang Rong et al. v. Liaoning Provincial Gov't*, 362 F. Supp. 2d 83, 103 (D.D.C. 2005).  This appeal followed, in which Rong challenges the district court's rejection of the commercial activity exception.[5]

## II.

We review de novo a district court order dismissing an action brought under FSIA on the ground of sovereign immunity.  *Gulf Res. Am., Inc. v. Republic of the Congo*, 370 F.3d 65, 70 (D.C. Cir. 2004).  FSIA is "the sole basis for obtaining jurisdiction over a foreign state in our courts." *Peterson v. Royal Kingdom of Saudi Arabia*, 332 F. Supp. 2d 189, 195 (D.D.C. 2004) (quoting *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989)); *see also Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 443 (D.C. Cir. 1990).  A foreign state is

---

[4]The expropriation exception provides in part that a foreign state may be sued in a U.S. court in a case "in which rights in property taken in violation of international law are in issue and that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state; or that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States."  28 U.S.C. § 1605(a)(3).

[5]Rong does not appeal the district court's decision regarding the expropriation exception.  *See* Appellant's Br. 2 n.1.

immune from suit in the United States unless its challenged action comes within one of the exceptions enumerated in the Act. *See* 28 U.S.C. § 1604. "If the defendant challenges only the legal sufficiency of the plaintiff's jurisdictional allegations, then the district court should take the plaintiff's factual allegations as true and determine whether they bring the case within any of the exceptions to immunity invoked by the plaintiff." *Mwani v. bin Laden*, 417 F.3d 1, 15 (D.C. Cir. 2005) (quoting *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1127 (D.C. Cir. 2004)). If a foreign state "argues that even if taken as true, the [plaintiff's] allegations are insufficient to come within the commercial activity exception[, t]his amounts to a challenge to the legal sufficiency of the allegations." *Id.* "[J]urisdiction will not obtain," and the court may dismiss a complaint on that basis, "if the cause of action is based on a sovereign activity." *Millen Indus., Inc. v. Coordination Council for N. Am. Affairs*, 855 F.2d 879, 885 (D.C. Cir. 1988).

FSIA's commercial activity exception provides that a foreign state is not immune from suit in a U.S. court if its challenged act is "based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States." 28 U.S.C. § 1605(a)(2). In determining whether the "commercial activity" exception applies, the court looks to the character of the foreign state's exercise of power rather than its effects. *See Saudi Arabia v. Nelson*, 507 U.S. 349, 360 (1993) (foreign state engages in commercial activity if it exercises "only those powers that can also be exercised by private citizens" as opposed to those "powers peculiar to sovereigns")

(quotations omitted); *Republic of Argentina v. Weltover*, 504 U.S. 607, 614 (1992) (sovereign engages in commercial activity if it acts "not as a regulator of a market, but in the manner of a private player within it"; issue is whether "the particular actions that the foreign state performs (whatever the motive behind them) are the *type* of actions by which a party engages in trade and traffic or commerce") (emphasis in original) (quotations omitted).

Here Rong claims that the Province's "implementation of the scheme to take Plaintiff's shares, other equity interests, and other property and then to maintain control thereof for its own commercial benefit," 1st Am. Compl. ¶ 14, JA 27, was "commercial activity" under the third clause of 28 U.S.C. § 1605(a)(2), that is, an act "outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States." In *Weltover*, the United States Supreme Court declared that the analysis of the third clause of section 1605(a)(2) proceeds in three parts: 1) the lawsuit must be based upon an act that took place outside the territory of the United States; 2) the act must have been taken in connection with a commercial activity, and 3) the act must have caused a direct effect in the United States. *Weltover*, 504 U.S. at 611. Here there is no dispute that the act took place outside the U.S. The questions in dispute are (1) whether the Province's act was done "in connection with a commercial activity" in China, and (2) if so, whether it caused a "direct effect in the United States." Because we answer the first question in the negative, we do not reach the second.

In *Weltover*, the Argentine government had issued bonds, or "Bonods," which provided for repayment in U.S. dollars and permitted the bondholder to specify one of four cities, including New York City, as the location where payment was

to be made on the date the bonds matured. When the maturity date arrived, Argentina was unable to meet its obligations and attempted to reschedule the payments unilaterally. Several bondholders balked, demanding full payment in U.S. dollars and naming New York City as the place of payment. When Argentina failed to make the payments, the bondholders sued, asserting subject matter jurisdiction under the commercial activity exception of section 1605(a)(2) of FSIA. The Supreme Court agreed with the bondholders, concluding that Argentina's issuance of a "garden-variety" debt instrument was indistinguishable from the actions of a private party engaged in commerce. In issuing the Bonods Argentina was participating in the market as a private actor, not as a sovereign. Because that act underlay the bondholders' claims and the nonpayment of bonds to be paid in New York City had a direct effect in the United States, the third clause of section 1605(a)(2) applied and Argentina could be sued in federal court under FSIA. *Weltover*, 504 U.S. at 612–17.

The parties here do not agree on the conduct of the Province that forms the basis of Rong's suit. Rong focuses on the Province's activities *in toto*—including Shen Yang City's initial participation in the Shen Yang Automotive joint venture, the Working Committee's establishment of Huachen, the transfer of Brilliance Holdings shares from the Foundation to Huachen and Huachen's tender offer for the outstanding publicly traded Brilliance Holdings shares—and claims they are the acts of a private player participating in the marketplace. The Province, on the other hand, focuses on Rong's allegation that his property "was wrongfully taken . . . by the Liaoning Provincial Government"; the Province asserts Rong accuses it of expropriating Broadsino's equity interest in Brilliance Holdings and expropriation is a quintessential governmental act. Appellee's Br. 17–18 (citing 1st Am. Compl. ¶¶ 1, 37, 53, JA 23, 37, 43). According to the

Province, any act it committed *after* it gained control of the Foundation and the Brilliance Holdings shares—including the transfer of those shares to Huachen—relates to the ultimate disposition of the already expropriated assets; those acts, the Province continues, cannot transform the initial expropriation into commercial activity. *Id.* 22–23. Rong contends that the Working Committee was formed to take over Brilliance Holdings through the Foundation; that act, maintains the Province, forms the basis of the complaint and is one that can be performed only by a state as sovereign.

It may be true that in some respects the Working Committee's takeover of the Foundation and its ownership of the Brilliance Holdings shares seem commercial—for example, removing Yang Rong from the Brilliance Holdings board and placing Working Committee officials in those same positions. But all of these acts flow from the Working Committee's "state assets" declaration—an act that can be taken only by a sovereign. Rong is correct that this case has some similarity to *Foremost-McKesson*, *supra*, where we found the Republic of Iran's takeover of a dairy business commercial, in part because there was "no indication that Iran nationalized Pak Dairy by taking it over through a process of law," no formal declaration by the government of Iran that a takeover was to occur and no "statutory restrictions or governmental decrees or directives" referring to the takeover. *Foremost-McKesson*, 905 F.2d at 449–50. In *Foremost-McKesson*, however, the plaintiff and various instrumentalities of Iran entered into a formal contract for an agreed-upon venture; the commercial activity there was the sovereign instrumentalities' use of their "majority position to lock the appellee out of the management of the dairy and to deny the appellee its share of the company's earnings." *Id.* at 439. We affirmed the district court's conclusion that those allegations "sound[ed] in the nature of a corporate dispute

between majority and minority shareholders"—allegations of breach of contract and of the directors' duty of care, with the only distinction being that the majority shares were held by the Iranian government and its subsidiaries rather than by a private party. *Id.* at 449–50. Here, by contrast, there was no contractual relationship between Yang Rong and the Province regarding the Foundation. The Province did not assume control over Brilliance Holdings by purchasing the majority of Brilliance Holdings' stock from Broadsino, as a private party would; instead, it declared the Brilliance Holdings shares held by the Foundation to be state assets and claimed them as does a sovereign. A private party in the market could not have done what the Province did here—form a committee whose goal, as Rong's complaint describes it, was to "assume and exercise control over the Foundation and to acquire from it the Brilliance Holdings shares that it held in trust for Broadsino" by "advis[ing] Yang Rong that all equity interests held in the name of the Foundation . . . were state assets and demand[ing] that they be transferred to the [Province]." 1st Am. Compl. ¶ 35, JA 36. These acts, initiated by the Assistant Governor of the Province and put into effect by the Working Committee, constituted a quintessentially sovereign act, not a corporate takeover.

Despite Rong's argument that the Province's use of the Brilliance Holdings shares after expropriating them independently establishes jurisdiction, the Province's subsequent acts of forming Huachen and transferring the Brilliance Holdings shares to Huachen did not transform the Province's expropriation into commercial activity. As the district court pointed out, Rong's complaint alleges that by the time of the stock transfer to Huachen, the Province had already wrested control of the shares; Huachen was not established until six months after the shares belonged to the Province. *Yang Rong*, 362 F. Supp. 2d at 97 (citing Compl. ¶¶

35, 37). Neither Yang Rong's refusal to comply with the Working Committee's demand to transfer the Brilliance Holdings shares nor the Province's subsequent transfer of them to Huachen at a "firesale" price makes the Province's expropriation commercial activity. If Rong's interpretation of commercial activity were correct, then almost any subsequent disposition of expropriated property could allow the sovereign to be haled into a federal court under FSIA. Such a result is inconsistent with our precedent, the decisions of other circuits and the Act's purpose. *See Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 87–88 (D.C. Cir. 2002) (under "restrictive" theory of sovereign immunity, FSIA presumes preclusion of suit against foreign state subject to "discrete and limited exceptions"); *Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan*, 115 F.3d 1020, 1030 (D.C. Cir. 1997) (plaintiffs' attempt to bring suit against sovereign on basis sovereign acted commercially "confuse[s] general activity related to the claim with the specific activity upon which the claim is based"); *Garb v. Republic of Poland*, 440 F.3d 579, 587 (2d Cir. 2006) ("subsequent commercial transactions involving expropriated property do not give rise to subject matter jurisdiction over claims arising from the original expropriation"); *Beg v. Islamic Republic of Pakistan*, 353 F.3d 1323, 1326–27 (11th Cir. 2003) (same); *De Letelier v. Republic of Chile*, 748 F.2d 790, 796 (2d Cir. 1984) (FSIA's legislative history makes clear courts should not deem activity commercial simply because aspects of activity are commercial). *But see Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 708–11 (9th Cir. 1992) (Argentina's expropriation of hotel was commercial because government generated revenue from American tourists and paid for advertising in the United States).

For the foregoing reasons, the district court's dismissal of the complaint for lack of subject matter jurisdiction is affirmed.

*So ordered.*

KAREN LeCRAFT HENDERSON, *Circuit Judge*, concurring:

While not necessary to our holding, *see Cicippio v. Islamic Republic of Iran*, 30 F.3d 164, 168-69 (D.C. Cir. 1994), *cert. denied*, 513 U.S. 1078 (1995), I believe that the district court can be affirmed just as soundly on the ground that the Province's activity had no direct effect in this country within the meaning of the third clause of section 1605(a)(2) of FSIA. Rong claims that the Working Committee's taking of Brilliance Holdings stock, his removal from executive and management positions in Brilliance Holdings and the suspension of trading of Brilliance Holdings shares on the NYSE deprived him of financial assets, compensation, dividends and corporate control and thus had a direct effect in the U.S. A mere financial loss by a resident of the United States does not constitute a "direct effect" in the United States. *Zedan v. Kingdom of Saudi Arabia*, 849 F.2d 1511, 1514 (D.C. Cir. 1988) (plaintiff's presence in U.S. was not direct effect because "financial hardship fortuitously suffered *in the United States* is not a direct effect of Saudi Arabia's failure to honor a contract in Saudi Arabia") (emphasis in original); *see also Soudavar v. Islamic Republic of Iran*, 67 F. App'x. 618, 619 (D.C. Cir. June 10, 2003) (unpublished judgment). Unlike the allegations of direct effect in *Foremost-McKesson*—not merely nonpayment but also cessation of the "flow of capital, management personnel, engineering data, machinery, equipment, materials and packaging" between Iran and the United States, *see Foremost-McKesson*, 905 F.2d at 451—here the direct effect involves only the monetary loss of a Chinese national resident in the U.S. In addition, Broadsino's status as a foreign corporation does alter the no "direct effect" determination. *See Stena Rederi AB v. Comision de Contratos del Comite Ejecutivo General del Sindicato Revolucionario de Trabajadores Petroleros de la Republicana Mexicana*, 923 F.2d 380, 390 (5th Cir. 1991) (foreign corporation's monetary loss in U.S. insufficient for direct effect in United States under section 1605(a)(2)).

As to his other claims of direct effect, Rong argues that the direct effect in *Foremost-McKesson*—i.e., the interference with the plaintiff's right to participate in management and as an active investor and the illegal installation of new directors by the foreign sovereign—is on all fours with the direct effect here. McKesson, however, was an American corporation while Broadsino is incorporated under the laws of Hong Kong. *See Foremost-McKesson,* 905 F.2d at 441; *see also Int'l Hous. Ltd. v. Rafidain Bank Iraq*, 893 F.2d 8, 11 (2d Cir. 1989) ("The fact that some or all of IHL's principals or officers may be United States citizens does not outweigh the facts that they organized the company outside the United States and that its losses in the instant transaction thus occurred elsewhere.") *Weltover* is not to the contrary. *Weltover,* 504 U.S. at 619 (U.S. was "place of performance for Argentina's ultimate contractual obligations"; rescheduling of obligations therefore had direct effect in U.S. because "[m]oney that was supposed to have been delivered to a New York bank for deposit was not forthcoming"); *see also Walpex Trading Co. v. Yacimientos Petroliferos Fiscales Bolivianos*, 712 F. Supp. 383, 389-90 (S.D.N.Y. 1989) (direct effect in United States found when commercial activity of Bolivian government's instrumentality occurred outside U.S. because contract was to be performed primarily in United States and foreign buyer utilized U.S. banking resources to facilitate payment). In the Second Circuit's *Weltover* decision (unanimously affirmed by the Supreme Court), the court declared that courts "often look to the place where legally significant acts giving rise to the claim occurred" to determine the location of a "direct effect." *Weltover, Inc. v. Argentina*, 941 F.2d 145, 152 (2d Cir. 1991); *see also United World Trade, Inc. v. Mangyshlakneft Oil Prod. Ass'n*, 33 F.3d 1232, 1239 (10th Cir. 1994), *cert. denied*, 513 U.S. 1112 (1995) (rejecting American citizen's claim that his lost profits caused by foreign state's alleged breach of oil contract entered into by parties in Moscow specifying delivery of oil to Sicily with payment in Paris constituted direct effect under section 1605(a)(2):

"[a]ppellant would have us interpret § 1605(a)(2) in a manner that would give the district courts jurisdiction over virtually any suit arising out of an overseas transaction in which an American citizen claims to have suffered a loss from the acts of a foreign state. We think that the language of § 1605(a)(2) limiting jurisdiction to cases where there is a '*direct* effect' in the United States makes it unlikely that this was Congress' intent") (emphasis in original); *cf. I.T. Consultants, Inc. v. Islamic Republic of Pakistan*, 351 F.3d 1184, 1190 (D.C. Cir. 2003) (Pakistan's failure to meet payment obligation under contract providing for payment in Virginia had direct effect in U.S. because "the involvement of a U.S. bank was immediate and unavoidable"). Neither Rong's monetary loss nor his loss of control over Brilliance Holdings caused the necessary direct effect in the U.S. to allow him to sue the Liaoning Province. *Zedan*, 849 F.2d at 1515 (injury suffered in foreign country that has "eventual" effect in U.S. does not constitute direct effect). Nor is the loss allegedly suffered by third-party investors in the United States as a result of the one-day suspension of trading on the NYSE sufficient to establish a direct effect. *See Corzo v. Banco Central de Reserva del Peru*, 243 F.3d 519, 525-26 (9th Cir. 2001) (if cause of action arises entirely in foreign country, "[t]he fact that United States computer companies might have been affected by . . . breaches [resulting from Peruvian bank's act] is jurisdictionally irrelevant").